UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA (CHARLOTTE)

| | |
|---|---|
| IN RE WACHOVIA CORPORATION ERISA LITIGATION | MASTER FILE: 3:09-CV-00262-MR |
| THIS DOCUMENT RELATES TO:<br>    All Actions | |

**CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT**

# TABLE OF CONTENTS

II.    NATURE OF THE ACTION ........................................................................ 5

III.   JURISDICTION .................................................................................... 9

IV.    PARTIES ........................................................................................... 9

    A.    Plaintiffs ...................................................................................... 9

    B.    Defendants ................................................................................. 11

V.    THE PLANS ...................................................................................... 17

    A.    Wachovia Savings Plan............................................................... 18

    B.    A.G. Edwards, Inc. Retirement and Profit Sharing Plan .................... 20

    C.    ESOP Fiduciaries are Bound by Core ERISA Fiduciary Duties. ........ 23

    D.    The Plans Incurred Significant Losses during the Class Period. ........ 24

VI.    DEFENDANTS' FIDUCIARY STATUS ....................................................... 25

    A.    The Nature of Fiduciary Status...................................................... 25

    B.    Wachovia's Fiduciary Status ........................................................ 26

    C.    The Director Defendants' Fiduciary Status ...................................... 28

    D.    Management Resources & Compensation Committee Defendants'
        Fiduciary Status ......................................................................... 29

    E.    Wachovia Benefits Committee Defendants' Fiduciary Status............. 30

VII.   FACTS BEARING ON FIDUCIARY BREACH.............................................. 32

    A.    Wachovia Was an Imprudent Investment for the Plans during the
        Class Period Because of Its Improper Business Practices,
        Mismanagement of Risk, and Rapidly Deteriorating Financial
        Condition.................................................................................... 32

        1.    Background: The Rise and Fall of the Subprime Market
            and Emergence of the Mortgage and Credit Crises ............... 34

            a.    Subprime and Alt-A Lending Fueled the Housing
                Market. ...................................................................... 35

            b.    MBS and CDOs Fuel the Secondary Market............................. 36

2. Wachovia: Its Rise and Fall ..................................................... 40

    a. Wachovia's Overexposure to Risky Subprime Loans and the Contracting Credit Market Precipitates the Company's Near Collapse. ............................... 40

        (i) Wachovia Enters the High-Risk Warehouse Lending Market. .............................................. 40

        (ii) Wachovia Increases Its Subprime Exposure Through the Acquisition of Golden West. ...................... 41

        (iii) Overexposed to and Dependent on the Subprime and Credit Markets, Wachovia's Troubles Continue. ........................................... 44

    b. Wachovia's Overreliance on Inadequate Risk Management and Accounting Practices Inflates the Company's Stock Price and Introduces Another Layer of Risk. ................................................................ 47

        (i) Wachovia's Risk Modeling Was Inaccurate and Faulty. ....................................................... 49

        (ii) Wachovia Violated Accounting Principles and Standards. ................................................... 53

        (iii) Wachovia's Internal Controls Were Deficient. ................................................................. 57

B. Defendants Knew or Should Have Known That Wachovia Stock Was an Imprudent Investment. ............................................. 57

    1. Defendants Knew the Company Was at Risk and that Company Stock Was Imprudent Due to the Company's Improper Business Practices. ....................................... 58

    2. Published Warnings and Red Flags Place the Plans' Fiduciaries on Notice of the Need to Investigate Risks at Wachovia. ................................................................. 59

C. Defendants Failed to Provide the Plans' Participants with Complete and Accurate Information about the True Risks of Investment in Wachovia Stock in the Plans. ....................... 70

D. Defendants Suffered From Conflicts of Interest. ................. 74

VIII. THE RELEVANT LAW ...................................................................... 74

IX.    CAUSES OF ACTION ................................................................................ 77

    A.    Count I:  Failure to Prudently and Loyally Manage the Plans and
          Assets of the Plans. .............................................................................. 77

    B.    Count II:  Failure to Monitor Fiduciaries............................................. 83

    C.    Count III: Breach of Fiduciary Duty to Disclose Necessary
          Information to Co-Fiduciaries............................................................... 85

    D.    Count IV: Breach of Fiduciary Duty – Failure to Provide Complete
          and Accurate Information to the Plans' Participants and
          Beneficiaries. ....................................................................................... 86

    E.    Count V:  Co-Fiduciary Liability......................................................... 88

    F.    Count VI:  Knowing Participation in a Breach of Fiduciary Duty
          by a Non-Fiduciary ............................................................................. 91

X.    CAUSATION ........................................................................................... 91

XI.    REMEDY FOR BREACHES OF FIDUCIARY DUTY ................................ 92

XII.    CLASS ACTION ALLEGATIONS .......................................................... 94

XIII.    PRAYER FOR RELIEF ............................................................................ 96

# I. INTRODUCTION

1.      Plaintiffs Todd A. Wright, Alan A. Hardman, Richard F. Dziak, David W. Allen, Robert M. Cominsky, Rose Hansen, Denise A. Tuttle, and Jerry R. Kelley, Jr. ("Plaintiffs") allege the following based upon personal information as to themselves and the investigation of Plaintiffs' counsel, which included: review of U.S. Securities and Exchange Commission ("SEC") filings by Wachovia Corp. ("Wachovia" or the "Company"), including Wachovia's proxy statements (Form DEF 14A), annual reports (Form 10-K), quarterly reports (Form 10-Q), current reports (Form 8-K), and the annual reports (Form 11-K) filed on behalf of the Wachovia Savings Plan ("Wachovia Plan") and the A.G. Edwards, Inc. Retirement and Profit Sharing Plan ("AGE Plan") (collectively, "Plans"); review of the Forms 5500 filed by the Plans with the U.S. Department of Labor ("DOL"); interviews with participants of the Plans; review of publicly available court documents, articles, reports, government testimony, and interviews regarding Wachovia; and review of available documents governing the operations of the Plans, including the limited selection of documents produced by Defendants pursuant to an agreement between the parties.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II. NATURE OF THE ACTION

2.      This is a class action brought on behalf of the Plans pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1132(a)(2) & (a)(3), against the fiduciaries of the Plans for violations of ERISA and against Wells Fargo & Company ("Wells Fargo"), by virtue of its status as successor-in-interest to Wachovia.

3.      Plaintiffs' claims arise from the failure of fiduciary Defendants to act solely in the interest of the participants and beneficiaries of the Plans, and to exercise the required skill, care, prudence, and diligence in administering the Plans and the Plans' assets from May 8, 2006 to December 31, 2008 ("Class Period").

4.      Plaintiffs allege that fiduciary Defendants allowed the heavy, imprudent investment of the Plans' assets in Wachovia common stock throughout the Class Period despite the fact that they clearly knew or should have known that such investment was unduly risky and imprudent due to Company's serious mismanagement and improper business practices, including, among other practices: (a) the Company's reckless concentration on loan production in spite of the declining mortgage market; (b) the Company's failure to limit its exposures and risks especially with respect to the acquisition of Golden West Financial Corporation ("Golden West"); (c) the Company's failure to accurately account for its high-risk mortgage and collateralized debt obligations ("CDO") holdings; (d) the Company's imprudent loan underwriting practices and reliance on inadequate risk management and accounting practices; and (e) Wachovia's repeated misrepresentations of the Company's true financial condition, all of which caused Wachovia's financial statements to be misleading and artificially inflated the value of Wachovia stock in the Plans.  These events ultimately led to the near collapse of Wachovia and its fire-sale to Wells Fargo.

5.      In short, during the Class Period, the Company was seriously mismanaged and faced seriously deteriorating financial circumstances that rendered Wachovia stock an unduly risky and inappropriate investment option for participants' retirement savings.  Top management, including certain Defendants, had a complete picture of how all of the foregoing practices made Wachovia stock an unduly risky and inappropriate investment for Plan participants' retirement

accounts. To the extent any Defendant lacked actual knowledge of these risks, they would have been revealed had Defendants conducted the investigation required by ERISA.

6. Wells Fargo is named as a Defendant by virtue of its position as successor-in-interest to Wachovia. Unlike all of the other Defendants, Wells Fargo is not being sued for breach of fiduciary duty.

7. Specifically, Plaintiffs allege in Count I that Defendants who were responsible for the investment of the Plans' assets breached their fiduciary duties to the Plans' participants and beneficiaries in violation of ERISA by failing to prudently and loyally manage the Plans' investment in Wachovia stock; Wells Fargo is named as Defendant in Count I because of its status as successor-in-interest to Wachovia. In Count II, Plaintiffs allege that Defendants who were responsible for the selection, monitoring and removal of the Plans' other fiduciaries failed to properly monitor the performance of their fiduciary appointees and remove and replace those whose performance was inadequate; Wells Fargo is named as Defendant in Count II because of its status as successor-in-interest to Wachovia. In Count III, Plaintiffs allege that Defendants with knowledge of the risks associated with Wachovia stock breached their duty to disclose necessary information to co-fiduciaries; Wells Fargo is named as Defendant in Count III because of its status as successor-in-interest to Wachovia. In Count IV, Plaintiffs allege that Defendants breached their duty to inform the Plans' participants by failing to provide complete and accurate information regarding the soundness of Wachovia stock and the prudence of investing and holding retirement contributions in Wachovia equity; Wells Fargo is named as Defendant in Count IV because of its status as successor-in-interest to Wachovia. In Count V, Plaintiffs allege that Defendants breached their duties and responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries of their duties of prudent and loyal management, complete and

accurate communications, and adequate monitoring; Wells Fargo is named as Defendant in Count V because of its status as successor-in-interest to Wachovia. Finally, in Count VI, Plaintiffs state a claim against Wells Fargo because of its status as successor-in-interest to Wachovia, for Wachovia's knowing participation in the fiduciary breaches alleged herein.

8.     As more fully explained below, during the Class Period, the fiduciary Defendants imprudently permitted the Plans to hold and acquire Wachovia stock despite the fundamental problems the Company faced. Based on publicly available information for the Plans, it appears that Defendants' breaches have caused the Plans a principal loss of nearly *$2 billion* in retirement savings.

9.     This action is brought on behalf of the Plans and seeks to recover losses to the Plans for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2). In addition, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief. And in the case of Wells Fargo, because of its status as successor-in-interest to Wachovia.

10.    ERISA §§ 409(a) and 502(a)(2) authorize participants such as Plaintiffs to sue in a representative capacity for losses suffered by the Plans as a result of breaches of fiduciary duty. Pursuant to that authority, Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23 on behalf of all participants and beneficiaries of the Plans whose Plan account was invested in Wachovia common stock during the Class Period.

11.    In addition, because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs'

allegations are made by necessity upon information and belief. At such time as Plaintiffs have had the opportunity to conduct discovery, Plaintiffs will, to the extent necessary and appropriate, amend this complaint, or, if required, seek leave to amend, to add such other additional facts as are discovered that further support Plaintiffs' claims.

## III.   JURISDICTION

12.     **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

13.     **Personal Jurisdiction.** ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All Defendants are either residents of the United States or subject to service in the United States and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A), because they would all be subject to the jurisdiction of a court of general jurisdiction in the State of North Carolina.

## IV.   PARTIES

**A.     Plaintiffs**

14.     Plaintiff Todd A. Wright is a resident of Canton, Georgia. Plaintiff Wright is, and at all relevant times has been, a participant in the Wachovia Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). At all relevant times, a portion of his retirement account was invested in Wachovia common stock.

15.     Plaintiff Alan A. Hardman is a resident of Toms River, New Jersey. Plaintiff Hardman is, and at all relevant times has been, a participant in the Wachovia Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). At all relevant times, a portion of his retirement account was invested in Wachovia common stock.

16. Plaintiff Richard F. Dziak is a resident of Las Cruces, New Mexico. Plaintiff Dziak is, and at all relevant times has been, a participant in the AGE Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). At all relevant times, a portion of his retirement account was invested in units of Wachovia common stock.

17. Plaintiff David W. Allen is a resident of Birmingham, Alabama. Plaintiff Allen is, and at all relevant times has been, a participant in the Wachovia Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). At all relevant times, a portion of his retirement account was invested in Wachovia common stock.

18. Plaintiff Robert M. Cominsky is a resident of Charlotte, North Carolina. Plaintiff Cominsky is, and at all relevant times has been, a participant in the Wachovia Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). At all relevant times, a portion of his retirement account was invested in Wachovia common stock.

19. Plaintiff Rose Hansen is a resident of Oviedo, Florida. Plaintiff Hansen is, and at all relevant times has been, a beneficiary of the Wachovia Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). At all relevant times, a portion of her retirement account was invested in Wachovia common stock.

20. Plaintiff Denise A. Tuttle is a resident of Largo, Florida. Plaintiff Tuttle is, and at all relevant times has been, a participant in the Wachovia Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). At all relevant times, a portion of her retirement account was invested in Wachovia common stock.

21. Plaintiff Jerry R. Kelley, Jr. is a resident of Concord, North Carolina. Plaintiff Kelley is, and at all relevant times has been, a participant in the Wachovia Plan within the

meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  For a certain period during the relevant time, a portion of his retirement account was invested in Wachovia common stock.

**B.    Defendants**

22.    **Defendant Wachovia Corp.**, a North Carolina corporation, has its principal place of business at One Wachovia Center, 301 South College Street, Charlotte, North Carolina. During the Class Period, Wachovia provided a wide range of commercial and retail banking and trust services throughout the United States.  The Company also provided additional financial services, including mortgage banking, investment banking, investment advisory, home equity lending, asset-based lending, leasing, insurance, and international and securities brokerage services, through its subsidiaries.  Wachovia had four key businesses, including Capital Management, the General Bank, Wealth Management and the Corporate and Investment Bank. During the Class Period, Wachovia common stock was listed on the New York Stock Exchange and traded under the ticker symbol "WB."

23.    **Defendants Wells Fargo & Co.** a Delaware corporation, has its principal place of business at 420 Montgomery Street, San Francisco, California.  Wells Fargo is a diversified financial services company that provides retail, commercial and corporate banking services.  It has banking stores located in 39 states and the District of Columbia.  Wells Fargo provides additional financial services through subsidiaries that are engaged in various businesses, principally: wholesale banking, mortgage banking, consumer finance, equipment leasing, agricultural finance, commercial finance, securities brokerage and investment banking, insurance agency and brokerage services, computer and data processing services, trust services, investment advisory services, mortgage-backed securities servicing and venture capital investment.  Well's Fargo's three operating segments for management reporting purposes are Community Banking,

Wholesale Banking, and Wells Fargo Financial. Wells Fargo's common stock is listed on the New York Stock Exchange and trades under the ticker symbol "WFC."

24.     On December 31, 2008, pursuant to the terms and conditions of the Agreement and Plan of Merger, dated October 3, 2008 ("Merger Agreement"), between Wells Fargo and Wachovia, Wells Fargo and Wachovia completed a merger ("Merger") in which Wachovia merged with and into Wells Fargo, with Wells Fargo as the surviving corporation. *See* Wells Fargo Current Report (Form 8-K) (July 18, 2007); *see also* Wells Fargo Current Report (Form 8-K) (July 18, 2007) at Ex. 99.1. Pursuant to the Merger Agreement and by operation of corporate law, Wells Fargo has succeeded to all liabilities of Wachovia. Wachovia shareholders received 0.1991 shares of Wells Fargo common stock in exchange for each share of Wachovia common stock they owned. *Id*.

25.     Upon the completion of the Merger with Wachovia on December 31, 2008, Wells Fargo took over all Wachovia's operations and implemented a plan to integrate and convert all existing Wachovia Bank facilities into Wells Fargo Bank facilities on a state-by-state basis. Additionally, Wachovia Securities was renamed and became Wells Fargo Advisors.

26.     **Director Defendants.** During the Class Period, the Wachovia Board of Directors ("Board") was the governing body of Wachovia under its charter, its bylaws, and applicable North Carolina law. As is explained in more detail below, the Board had certain responsibilities with respect to the Plans, including appointment and oversight responsibilities, and the Board and its members were therefore fiduciaries of the Plans. The Board and its members listed below are referred to as the "Director Defendants." On information and belief the members of the Director Defendants during the Class Period included:

a.     **Defendant John D. Baker II** served as a director of Wachovia from 2001

until December 31, 2008;

b.       **Defendant Peter C. Browning** served as a director of Wachovia from 2001 until December 31, 2008;

c.       **Defendant John T. Casteen III** served as a director of Wachovia from 2001 until December 31, 2008**;**

d.       **Defendant Jerome A. Gitt** served as a director of Wachovia from 2006 until December 31, 2008;

e.       **Defendant William H. Goodwin, Jr.** served as a director of Wachovia from 1993 until December 31, 2008;

f.       **Defendant Maryellen C. Herringer** served as a director of Wachovia from 2006 until December 31, 2008;

g.       **Defendant Robert A. Ingram** served as a director of Wachovia from 2001 until December 31, 2008;

h.       **Defendant Donald M. James** served as a director of Wachovia from 2004 until December 31, 2008;

i.       **Defendant Mackey J. McDonald** served as a director of Wachovia from 1997 until December 31, 2008;

j.       **Defendant Joseph Neubauer** served as a director of Wachovia from 1996 until December 31, 2008;

k.       **Defendant Timothy D. Proctor** served as a director of Wachovia from 2006 until December 31, 2008;

l.       **Defendant Ernest S. Rady** served as a director of Wachovia from 2006 until December 31, 2008;

m. **Defendant Van L. Richey** served as a director of Wachovia from 2004 until December 31, 2008;

n. **Defendant Ruth G. Shaw** served as a director of Wachovia from 1990 until December 31, 2008;

o. **Defendant Lanty L. Smith** served as a director of Wachovia from 1987 and as Chairman of the Board of Directors of Wachovia from May 8, 2008 until December 31, 2008. Defendant Smith served as the Interim Chief Executive Officer from June 1, 2008 until July 9, 2008;

p. **Defendant Robert K. Steel** served as a director of Wachovia, President and Chief Executive Officer from July 9, 2008 to December 31, 2008;

q. **Defendant G. Kennedy Thompson** served as the Chairman of the Board of Directors of Wachovia from 2003 until May 8, 2008, and as a director from 1999 until his resignation effective June 1, 2008. Defendant Thompson also served as the Company's President and Chief Executive Officer until his resignation effective June 1, 2008; and

r. **Defendant Dona Davis Young** served as a director of Wachovia from 2001 until December 31, 2008.

27. **Management Resources and Compensation Committee Defendants.** As is explained in more detail below, the Management Resources and Compensation Committee ("Compensation Committee") was appointed by the Board and had responsibility for various oversight responsibilities. Defendants identified in this paragraph are referred to as the "Compensation Committee Defendants." On information and belief, the Compensation Committee Defendants during the Class Period were as follows:

a. **Defendant Browning** served as a member of the Compensation Committee during the Class Period;

b. **Defendant Ingram** served as a member of the Compensation Committee during the Class Period;

c. **Defendant McDonald** served as a member of the Compensation Committee during the Class Period;

d. **Defendant Proctor** served as a member of the Compensation Committee during the Class Period; and

e. **Defendant Shaw** served as a member of the Compensation Committee during the Class Period.

28.    **Wachovia Benefits Committee Defendants**.  As is explained in more detail below, the Plans assigned certain fiduciary responsibilities and duties to the Wachovia Benefits Committee ("Benefits Committee"), including the responsibility for selecting the investment funds in the Plans and for monitoring the performance of those funds.  The Benefits Committee members also have full authority and power to administer and construe the Plans.  Defendants identified in this paragraph are referred to as the "Benefits Committee Defendants."  On information and belief, the Benefits Committee Defendants during the Class Period were as follows:

a. **Defendant Bill Dawson** served as the Chief Risk Officer for Capital and Wealth Management Leadership at Wachovia during the Class Period;

b. **Defendant Larry Gilmer** served in the Compensation and Benefits Department at Wachovia during the Class Period;

c. **Defendant Rod Hoover** served as Chief Investment Officer, Wachovia

Pension and Savings Plan during the Class Period;

d.    **Defendant Benjamin J. Jolley** served as the Director of Benefits at
Wachovia during the Class Period;

e.    **Defendant Bill Langley** served as Chief Compliance Officer at Wachovia
during the Class Period;

f.    **Defendant Jeff Martin** served as Managing Executive for Financial
Planning at Wachovia during the Class Period;

g.    **Defendant Shannon McFayden** served as the Director of Human
Resources and Corporate Relations at Wachovia during the Class Period;

h.    **Defendant Robert Reid** served as the head of the Real Estate Division
within the Corporate and Investment Bank at Wachovia during the Class
Period;

i.    **Defendant Sharon Smart** served as the Executive Vice President, Human
Resources at Wachovia during the Class Period;

j.    **Defendant Cece Sutton** served as the head of the Retail and Small
Business Bank at Wachovia during the Class Period;

k.    **Defendant Ben Williams** served as a Managing Director, Head of Global
Capital Markets and Investment Banking at Wachovia during the Class
Period; and

l.    **Defendant Thomas J. Wurtz** served as the Chief Financial Officer at
Wachovia during the Class Period.

## V.   THE PLANS

29.     During the Class Period the Wachovia Plan,[1] was sponsored by Wachovia.  The

AGE Plan was sponsored by Wachovia effective October 1, 2007.[2]  *See* A.G. Edwards, Inc.

Retirement and Profit Sharing Plan Summary Plan Description and Prospectus, July 2009 ("2009

AGE Plan SPD"), AGE RPP-PA 000103-174 at AGE RPP-PA 000107.  The Plans are defined

contribution pension plans that are legal entities that can sue and be sued.  ERISA § 502(d)(1),

29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plans are

neither a defendant nor a plaintiff.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the

law interpreting it, the relief requested in this action is for the benefit of the Plans and their

participants and beneficiaries.

30.     The assets of an employee benefit plan, such as the Plans here, must be "held in

trust by one or more trustees."  ERISA § 403(a), 29 U.S.C. § 1103(a).  During the Class Period,

the assets of the Wachovia Plan were held in trust by Wachovia Bank, National Association,

pursuant to the trust agreement.  *See* Wachovia Savings Plan, Annual Report (Form 11-K) (Dec.

31, 2007) ("2007 Wachovia Plan 11-K") at Note 3; *see also* Wachovia Savings Plan, Annual

Report (Form 11-K) (Dec. 31, 2008) ("2008 Wachovia Plan 11-K") at Note 3.  The assets of the

AGE Plan were held in trust by The Northern Trust Company, pursuant to the trust agreement

during the Class Period.  *See* A.G. Edwards, Inc. Retirement and Profit Sharing Plan Trust (Dec.

31, 2008) ("AGE Trust Agreement"), AGE RPP-PA 000175-191.  All contributions made to the

Plans constitute a form of deferred compensation.

---

[1] Effective December 31, 2006, the assets of the Westcorp Employee Stock Ownership and Salary Savings Plan
were transferred to the Wachovia Savings Plan.  *See* Westcorp Employee Stock Ownership and Salary Savings
Plan, Annual Report (Form 11-K) (Dec. 31, 2006) at Note 11.

[2] The merger between Wachovia and A.G. Edwards was complete as of October 1, 2007 ("Effective Time of the
Merger").  *See* Wachovia Corp., Annual Report (Form 10-K) (Dec. 31, 2007) at Part I.

A. **Wachovia Savings Plan**

31.     The Wachovia Plan became effective on June 19, 1962.  The Wachovia Plan is designed to help participants "save for the future."  *See* Wachovia Savings Plan Summary Plan Description, 2007 ("2007 Wachovia Plan SPD"), WBD 000261-295 at WBD 000264; *see also* Wachovia Savings Plan Summary Plan Description, 2008 ("2008 Wachovia Plan SPD"), WSP-PA 000247-280 at WSP-PA 000250.

32.     During the Class Period, employees were eligible to participate in the Wachovia Plan on the first day of the month following one full month of employment.  *See* Wachovia Savings Plan (as Amended and Restated Effective January 1, 2007) ("2007 Wachovia Plan Document"), WBD 000001-260 at WBD 000038; *see also* Wachovia Savings Plan (as Amended and Restated Effective Jan. 1, 2008) ("2008 Wachovia Plan Document"), WSP-PA 000001-246 at WSP-PA 000038.

33.     At all relevant times, the Wachovia Plan consisted of: (1) participant's pre-tax contributions; (2) participant's after-tax contributions; and (3) employer matching contributions, ("Company Matching Contributions").  *Id.* at WBD 000040-41; *id.* at WSP-PA 000040-41.

34.     During the Class Period, participants were fully vested in their accounts at all times.  2007 Wachovia Plan Document at WBD 000064; 2008 Wachovia Plan Document at WSP-PA 000064.

35.     During the Class Period, participants in the Wachovia Plan were permitted to defer a percentage of their contributions for investment in the Wachovia Plan.  2007 Wachovia Plan SPD at WBD 000268; 2008 Wachovia Plan SPD at WSP-PA 000255.  Participants in the Wachovia Plan were allowed to contribute up to 30% of their eligible compensation.  *Id.*

36.     Throughout the Class Period, the Wachovia Plan offered various investment options for participant contributions, including: (1) the Wachovia Corp. Common Stock Fund,

for Plan participants employed by Wachovia, or one of its subsidies that was taxable as a corporation; and (2) the Wachovia Stock Non-ESOP Fund, for Wachovia Plan participants employed by an entity of the Company that was taxable as a partnership. 2007 Wachovia Plan Document at WBD 000036 and WBD 000077; 2008 Wachovia Plan Document at WSP-PA 000036 and WSP-PA 000077.

  37. Throughout the Class Period, the Company made Company Matching Contributions to the Wachovia Plan. Employees became eligible for Company Matching Contributions upon completing one year of service. 2007 Wachovia Plan Document at WBD 000041; 2008 Wachovia Plan Document at WSP-PA 000041. The amount of the participant's contributions that were matched and the rate of the Company Matching Contributions were determined annually by the Senior Executive Vice President of Human Resources which, upon information and belief, was Defendant McFayden for at least part of the Class Period. 2007 Wachovia Plan Document at WBD 000041; 2008 Wachovia Plan Document at WSP-PA 000041. The CEO of Wachovia reserved the right to reduce the matching rate. *Id.*

  38. The first one percent of the Company Matching Contribution was made in Wachovia common stock and credited to a participant's account in either (1) the Wachovia Corp. Common Stock Fund, for Plan participants employed by Wachovia, or one of its subsidies that is taxable as a corporation, or (2) in the Wachovia Stock Non-ESOP Fund, for Plan participants who are employed by an entity of the Company that is taxable as a partnership. *Id.* Company Matching Contributions in excess of the one percent were invested in the same manner as the participant's contributions. *Id.*

39.     The Benefits Committee, as the Plan Administrator, had authority to change the portion of Company Matching Contributions that was invested in the Wachovia Corp. Common Stock Fund or the Wachovia Stock Non-ESOP Fund.  *Id.*

40.     Participants could transfer Company Matching Contributions that were invested in either the Wachovia Corp. Common Stock Fund or the Wachovia Stock Non-ESOP Fund into other alternate investment options in the Wachovia Plan.  2007 Wachovia Plan SPD at WBD 000276; 2008 Wachovia Plan SPD at WSP-PA 000263.

41.     Nothing in the Wachovia Plan limited the ability of the Plan's fiduciaries to remove the Wachovia Corp. Common Stock Fund and the Wachovia Stock Non-ESOP Fund as investment alternatives, divest assets invested in the options, and/or eliminate the company match in Wachovia stock, as prudence dictates.

42.     On December 31, 2008, upon completion of the Merger, the participants and beneficiaries of the Wachovia Plan received 0.1991 shares of Wells Fargo common stock in exchange for each share of Wachovia common stock held in their Wachovia Plan account.  2008 Wachovia Plan 11-K at Note 3.

43.     Wells Fargo intends to merge the Wachovia Plan and transfer the Wachovia Plan assets into the Wells Fargo & Company 401(k) Plan as of December 31, 2009.  2008 Wachovia Plan 11-K at Note 12.

**B.      A.G. Edwards, Inc. Retirement and Profit Sharing Plan**

44.     The AGE Plan became effective on January 1, 1978.  The purpose of the AGE Plan is to encourage employees to "establish a regular method of savings and thereby create a fund available for their use at retirement or in the event of disability."  *See* A.G. Edwards, Inc. Retirement and Profit Sharing Plan, 2005 Restatement ("2005 AGE Plan Document"), AGE RPP-PA 000001-62 at AGE RPP-PA 000008.

45. The AGE Plan was closed to new participants on June 30, 2008. 2009 AGE Plan SPD at AGE RPP-PA 000107. Previously, employees of A.G. Edwards, who were not employees of Wachovia prior to the Effective Time of the Merger (October 1, 2007), were eligible to participate. *Id.*

46. As of the Effective Time of the Merger, the A.G. Edwards common stock in the AGE Plan was exchanged for Wachovia common stock. *See* AGE Plan 5500 for Year End 2007, AGE RPP-PA 000192-221 at AGE RPP-PA 000215. Each share of A.G. Edwards common stock was converted into a right to receive 0.9844 shares of Wachovia common stock and $35.80 in cash. Wachovia Corp., Current Report (Form 8-K) (May 30, 2007) at Item 8.01.

47. The AGE Plan offered both Participant and Company contributions. Participant contributions are held in an "Employee Account" that are established on the books by the Plan Administrator. 2005 AGE Plan Document at AGE RPP-PA 000023. Participant contributions designated for the Roth portion of the AGE Plan are credited on the books to their "Roth Account" and rollover contributions are held on the books in a "Rollover Account." *Id.* Company Contributions, which included both (1) Required Employer Non-Matching Contributions and (2) Discretionary Employer Non-Matching Contributions (collectively, "Company Contributions"), were allocated on the books to the participant's "Firm Account." *Id.* AGE RPP-PA 000023-24; Fourth Amendment, A.G. Edwards, Inc. Retirement and Profit Sharing Plan, 2005 Restatement, Sept. 28, 2007 ("Fourth Amendment AGE Plan"), AGE RPP-PA 000075-83 at AGE RPP-PA 000079.

48. Participants were permitted to defer up to 50% of their pre-tax compensation and up to 50% of their after-tax compensation for investment in their Employee Account and their Roth Account in the AGE Plan. 2005 AGE Plan Document at AGE RPP-PA 000016.

49.     After the Effective Time of the Merger, the AGE Plan offered the Wachovia Stock Fund among the various investment options for participant contributions. 2005 AGE Plan Document at AGE RPP-PA 000026; Fourth Amendment AGE Plan at AGE RPP-PA 000075-76.

50.     Required Employer Non-Matching Contributions were made by the Company in an amount equal to at least five percent of the first $170,000 of a participant's compensation for each AGE Plan Year. Fourth Amendment AGE Plan at AGE RPP-PA 000077. Discretionary Employer Non-Matching Contributions were not required. However, Wachovia could determine the amount of the discretionary contribution, if any. *Id.* Contributions were generally in the form of cash, but Wachovia could "direct that up to twenty-five percent (25%) of the Employer Non-Matching Contributions for a Plan Year be in the form of common stock of Wachovia." 2005 AGE Plan Document at AGE RPP-PA 000019; Fourth Amendment AGE Plan at AGE RPP-PA 000075.

51.     Participants were fully vested in their personal contributions and as of the Effective Time of the Merger, participants became fully vested in the amount credited to their Firm Account. Fourth Amendment AGE Plan at AGE RPP-PA 000081-82.

52.     Effective January 1, 2008, participants were no longer able to invest new contributions or transfer amounts into the Wachovia Stock Fund. Fifth Amendment, A.G. Edwards, Inc. Retirement and Profit Sharing Plan, 2005 Restatement, Dec. 24, 2007 ("Fifth Amendment AGE Plan"), AGE RPP-PA 000084-87 at AGE RPP-PA 000086. AGE Plan participants could continue to transfer out of the Wachovia Stock Fund on or after January 1, 2008. *Id.*

53.     On July 1, 2008, all active eligible participants became participants in the Wachovia Plan and stopped making contributions to the AGE Plan. *See* A.G. Edwards, Inc.

Retirement and Profit Sharing Plan, Financial Statements with Independent Auditors' Report, Dec. 31, 2007, AGE RPP-PA 000222-234 at AGE RPP-PA 000231.

54.     Nothing in the AGE Plan limited the ability of the Plan's fiduciaries to remove the Wachovia Stock Fund as an investment alternative or divest assets invested in the option as prudence dictates.

55.     Effective January 1, 2009, the AGE Plan received 0.1991 shares of Wells Fargo common stock in exchange for each share of Wachovia common stock that the AGE Plan held. 2009 AGE Plan SPD at AGE RPP-PA 000107.

56.     Upon information and belief, the date the assets of the AGE Plan will merge into the Wachovia Plan and/or the Wells Fargo & Company 401(k) Plan has not yet been determined. *See* 2008 Wachovia Plan 11-K at Note 1.

**C.     ESOP Fiduciaries are Bound by Core ERISA Fiduciary Duties.**

57.     According to the 2007 Wachovia Plan 11-K, effective January 1, 1999, the portion of Wachovia Plan invested in the Wachovia Corp. Common Stock Fund was amended to be an Employee Stock Ownership Plan ("ESOP"). 2007 Wachovia Plan 11-K at Note 1.

58.     According to the 2005 AGE Plan Document, effective January 1, 2002, amounts invested in the Employer Stock Fund within the AGE Plan constitute an ESOP. 2005 AGE Plan Document at AGE RPP-PA 000009; Fourth Amendment AGE Plan at AGE RPP-PA 000075.

59.     An ESOP is an ERISA plan that is designed to invest primarily—*i.e.*, not exclusively—in "qualifying employer securities." 29 U.S.C. § 1107(d)(6)(A). At this point in time, Plaintiffs are unable to confirm whether the Plans satisfied all of the statutory and regulatory mandates with respect to ESOP design and/or operation.

60.     Even if the portion of the Plans designated as ESOPs satisfy all of the applicable regulatory requirements for this designation, fiduciaries of an ESOP remain bound by core

ERISA fiduciaries duties—just like 401(k) plan fiduciaries generally—including the duties to act loyally, prudently, and for the exclusive purpose of providing benefits to plan participants.

61.     Accordingly, if the fiduciaries know or if an adequate investigation would reveal that company stock no longer is a prudent investment for the purported ESOP component of the plans, the fiduciaries must disregard plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other suitable investments.

**D.     The Plans Incurred Significant Losses during the Class Period.**

62.     During the Class Period, Wachovia common stock represented a significant portion of the Plans' assets.

63.     As of December 31, 2006, the Wachovia Plan held approximately 34 million shares of Wachovia stock, which had a market value of approximately $1.8 billion.  2007 Wachovia Plan 11-K at Note 3.

64.     As of December 31, 2007, the AGE Plan held approximately 11 million units of Wachovia common stock, which held an underlying investment of 2,127,443 shares of Wachovia common stock.  AGE Plan 5500 for Year End 2007 at AGE RPP-PA 000217.  As of that date, the Wachovia stock in the AGE Plan had a market value of approximately $88 million.  *Id*. at AGE Plan 5500 for Year End 2007 at AGE RPP-PA 000220.

65.     The Plans have incurred substantial losses as a result of the Plans' investment in Wachovia common stock following revelations of the Company's serious mismanagement and improper business practices, including, among other practices: (a) the Company's reckless concentration on loan production in spite of the declining mortgage market; (b) the Company's failure to limit its exposures and risks especially with respect to the acquisition of Golden West; (c) the Company's failure to accurately account for its high-risk mortgage and CDO holdings; (d) the Company's imprudent loan underwriting practices and reliance on inadequate risk

management and accounting practices; and (e) Wachovia's repeated misrepresentations of the Company's true financial condition, all of which caused Wachovia's financial statements to be misleading and artificially inflated the value of the Wachovia stock in the Plans.

## VI.    DEFENDANTS' FIDUCIARY STATUS

### A.    The Nature of Fiduciary Status

66.    **Named Fiduciaries.**  Every ERISA plan must have one or more "named fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

67.    ***De Facto* Fiduciaries.**  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

68.    With the exception of Wells Fargo, which stands in the shoes of Wachovia by virtue of its status as Wachovia's successor-in-interest, each Defendant was a fiduciary with respect to the Plans and owed fiduciary duties to the Plans and the participants and beneficiaries of the Plans in the manner and to the extent set forth in the Plans' documents, through their conduct, and under ERISA.

69.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C.

§ 1104(a)(1), to manage and administer the Plans and the Plans' investments solely in the interest

of the Plans' participants and beneficiaries and with the care, skill, prudence, and diligence under

the circumstances then prevailing that a prudent man acting in a like capacity and familiar with

such matters would use in the conduct of an enterprise of a like character and with like aims.

70.     Plaintiffs do not allege that each Defendant was a fiduciary with respect to all

aspects of the Plans' management and administration.  Rather, as set forth below, Defendants

were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or

exercised by each of them, and, as further set forth below, the claims against each Defendant are

based on such specific discretion and authority.

71.     Instead of delegating all fiduciary responsibility for the Plans to external service

providers, Wachovia chose to assign the appointment and removal of fiduciaries to the

Monitoring Defendants named herein.  These persons and entities in turn selected Wachovia

employees, officers, and agents to perform most fiduciary functions.

72.     ERISA permits fiduciary functions to be delegated to insiders without an

automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C.

§ 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of

participants and beneficiaries, not in the interest of the plan sponsor.

**B.     Wachovia's Fiduciary Status**

73.     On information and belief, in order to comply with ERISA, Wachovia exercised

responsibility for communicating with participants regarding the Plans in a plan-wide, uniform,

mandatory manner by providing participants with information and materials required by ERISA.

*See, e.g.*, ERISA § 101(a)(1), 29 U.S.C. § 1101(a)(1) (requiring the plan administrator to furnish

to each participant covered under the plan and to each beneficiary who is receiving benefits

under the plan a summary plan description).  In this regard, the Company disseminated the Plans' documents and related materials.

74.     On information and belief, the Company exercised authority and control with respect to the responsibilities of the remaining fiduciary Defendants, making itself fully responsible for the prudent and loyal fulfillment of the responsibilities assigned by the governing Plan documents to the those Defendants, without relieving them of any such responsibility.

75.     Moreover, Wachovia, at all applicable times, on information and belief, acted through and exercised control over the activities of its employees that performed fiduciary functions with respect to the Plans and, on information and belief, can hire or appoint, terminate, and replace such employees at will.  Thus, Wachovia is responsible for the activities of its employees through traditional principles of agency and *respondeat superior* liability.

76.     Additionally, under basic tenets of corporate law, Wachovia is imputed with the knowledge that Defendants had regarding the misconduct alleged herein, even if not communicated to Wachovia.

77.     Consequently, in light of the foregoing duties, responsibilities, and actions, Wachovia was a *de facto* fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that it exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

78.     Wachovia, as a corporate entity, cannot act on its own without any human counterpart.  In this regard, during the Class Period, Wachovia relied directly on the Director

Defendants, the Compensation Committee Defendants, and the Benefits Committee Defendants named herein to carry out its fiduciary responsibilities under the Plans and ERISA.

**C.    The Director Defendants' Fiduciary Status**

79.    During the Class Period the Board was a "named fiduciary" under the Wachovia Plan.  2007 Wachovia Plan Document at WBD 000084; 2008 Wachovia Plan Document at WSP-PA 000084.  The Board also had the responsibility to appoint, and hence to monitor and remove, the Trustee of the Wachovia Plan, and, on information and belief, to execute the Trust documents with the Trustee to provide for the investment, management and control of the assets of the Wachovia Plan.  2007 Wachovia Plan Document at WBD 000093; 2008 Wachovia Plan Document at WSP-PA 000093.

80.    Furthermore, under Wachovia's charter and bylaws, the Board had the authority to manage the business and affairs of Wachovia during the Class Period.  Because Wachovia was, as alleged above, a fiduciary of the Plans during the Class Period, so, necessarily, was the Board and its members, which had the ultimate authority for the affairs of Wachovia.

81.    Therefore, on information and belief, the Director Defendants acting on behalf Wachovia as the AGE Plan Sponsor, appointed the members of the Benefits Committee.  2005 AGE Plan Document at AGE RPP-PA 000050; Fourth Amendment AGE Plan at AGE RPP-PA 000083.  Moreover, the Director Defendants were also charged with the appointment of the following fiduciaries of the Wachovia Plan:  the Compensation Committee members; and the Benefits Committee members.  *See* Charter of the Management Resources & Compensation Committee at 1; 2007 Wachovia Plan Document at WBD 000084; 2008 Wachovia Plan Document at WSP-PA 000084.  Accordingly, the Director Defendants had the duty to monitor, and to remove, the Compensation Committee Defendants and the Benefits Committee

28

Defendants.  Thus, according to DOL regulations, the Director Defendants exercised a fiduciary function under ERISA.  29 C.F.R. § 2509.75-8 (D-4).

82.     Consequently, in light of the foregoing duties, responsibilities, and actions, the Director Defendants were both named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**D.     Management Resources & Compensation Committee Defendants' Fiduciary Status**

83.     The Management Resources & Compensation Committee was a committee of the Board during the Class Period.  According to the Charter of the Management Resources & Compensation Committee, the Compensation Committee Defendants had various responsibilities, including the following duty:

> To review and make policy recommendations from time to time with respect to various benefit plans for the Corporation's employees, including the pension and savings plans, group insurance plans, and such other plans as the Committee may from time to time deem advisable and appropriate, and, at the Committee's discretion, convey appropriate administrative authority to the Corporation's management of such plans….

Charter of the Management Resources & Compensation Committee at 3.

84.     The Compensation Committee was to report the information from its activities to the Board and, where appropriate, its recommendations for action by the Board.  *Id*. at 4. Consequently, in light of the foregoing duties, responsibilities, and actions, the Compensation Committee Defendants were *de facto* fiduciaries of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary

authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

## E. Wachovia Benefits Committee Defendants' Fiduciary Status

85. During the Class Period, the Benefits Committee was responsible for the selection of the investment options offered under the Wachovia Plan and was a "named fiduciary." 2007 Wachovia Plan Document at WBD 000077; 2008 Wachovia Plan Document at WSP-PA 000077. From the Effective Time of the Merger until the end of the Class Period, the Benefits Committee was also responsible for the selection of the investment options offered under the AGE Plan. 2005 AGE Plan Document at AGE RPP-PA 000026; Fourth Amendment AGE Plan at AGE RPP-PA 000080.

86. Additionally, the Benefits Committee was responsible for the oversight of all the Plans' investment options, including Company stock. *See* Wachovia Savings Plan Statement of Investment Policy, Adopted: November 30, 2003, Revised: August 31, 2006; January 26, 2007; June 28, 2007, WSP-PA 000375-400 at WSP-PA 000377; *see also* A.G. Edwards, Inc. Retirement and Profit Sharing Plan Statement of Investment Policy, Adopted: December 12, 2007, AGE RPP-PA 000235-262 at AGE RPP-PA 000237. This oversight responsibility included: (1) defining the Plans' investment objectives; (2) discussing asset classes and other investment alternatives offered under the Plans; (3) describing the criteria for selecting fund manager and managers of other investment alternatives; (4) describing the monitoring and measurement process, including watch status; (5) describing the process of terminating participation in funds and other investment alternatives; (6) addressing participant education; and (7) addressing proxy voting procedures. *Id.* at WSP-PA 000378; *id.* at AGE RPP-PA 000239.

87. The Benefits Committee also had authority to change the portion of Company Matching Contributions that were invested in Wachovia stock in the Wachovia Corp. Common Stock Fund or the Wachovia Stock Non-ESOP Fund in the Wachovia Plan. 2008 Wachovia Plan Document at WSP-PA 000041.

88. Finally, the Benefits Committee was also the "Plan Administrator" of the Plans during the Class Period. 2007 Wachovia Plan Document at WBD 000086; 2008 Wachovia Plan Document at WSP-PA 000086; 2005 AGE Plan Document at AGE RPP-PA 000050; Fourth Amendment AGE Plan at AGE RPP-PA 000083.

89. On information and belief, along with the Company, the Benefits Committee exercised responsibility for communicating with participants regarding the Plans in a plan-wide, uniform, mandatory manner, by providing participants with information and materials required by ERISA. *See, e.g.,* ERISA § 101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan a summary plan description). In this regard, the Benefits Committee disseminated the Plans' documents, such as the SPDs, and related materials on behalf of the Company.

90. Consequently, in light of the foregoing duties, responsibilities, and actions, the Benefits Committee Defendants were both named fiduciaries of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

## VII. FACTS BEARING ON FIDUCIARY BREACH

**A.** **Wachovia Was an Imprudent Investment for the Plans during the Class Period Because of Its Improper Business Practices, Mismanagement of Risk, and Rapidly Deteriorating Financial Condition.**

91. During the Class Period, Wachovia stock became an imprudent investment for Plan participants' retirement savings. Wachovia was financially mismanaged, which created dire financial circumstances that exposed the Plans to the risk of huge losses.

92. A fiduciary may not ignore circumstances, such as those here, that increase the risk of loss to participants and beneficiaries to an imprudent and unacceptable level.

93. Defendants' incomplete and inaccurate statements contributed to the artificial inflation of the value of the Company stock, creating and increasing the risk of loss. As the DOL, the agency charged with responsibility for enforcing ERISA, has stated, it is never prudent for a retirement plan fiduciary to purchase company stock that he knows or should know is artificially inflated. Brief of the Secretary of Labor as Amicus Curie Supporting Appellants and Requesting Reversal at 15-16, *In re Calpine Corp. ERISA Litig.*, No. 06-15013 (9th Cir. Nov. 16, 2006).

94. A variety of circumstances contributed to the unacceptable level of risk borne by the Plans' participants and beneficiaries as a result of the Plans' investment in Wachovia stock, including, but not limited to:

- Wachovia's overexposure business dependent on the tightening mortgage market and credit markets;

- the Company's failure to implement the business skill-set necessary to understand and manage the risks associated with the mortgage and credit markets;

- the Company's massive loan portfolio and focus on loan production despite deteriorating conditions in the housing market;

- Wachovia's overexposure to the high risks of residential and commercial mortgage-backed securities ("MBS"), CDOs, and other risky investment products

that faced illiquidity and deflating values as defaults increased and the market for these products dried up;

- the Company's involvement in the auction-rate securities market, which dried up during the Class Period and resulted in investor complaints regarding the marketing and disclosures of these supposedly conservative, liquefiable investments;

- the Company's failure to set aside adequate loan-loss reserves in anticipation of future losses, despite market volatility, constricted credit conditions, and steady declines in the mortgage market and fixed-income sectors;

- Wachovia's ill-timed acquisition of Golden West, one of the nation's largest originators of risky pay-option adjustable-rate mortgages, and its failure to accurately disclose the acquisition's effect on Wachovia's capital position and risk and loss exposure;

- the probe of Wachovia by Federal prosecutors in relation to alleged money laundering schemes surrounding the Mexican and Colombian drug trades;

- the inquiries by the U.S. Department of Justice, Internal Revenue Service, and SEC that focus on alleged bid-rigging in the management of cash raised by municipalities;

- the Company's involvement in a fraudulent telemarketing scheme that used "the bank's accounts to steal millions of dollars from unsuspecting victims"; and

- Defendants' attempts to conceal the magnitude of Wachovia's exposure to losses related to the above risk factors by providing a positive outlook for the Company when Defendants knew, or should have known, that the economy's steady decline meant that the Company's true financial condition would come to light and severely impact its inflated share price.

95.     Given the purpose of the Plans—to allow employees to save for retirement—the Plans' fiduciaries did not undertake any meaningful action to protect the Plans from the losses caused by the Plans holding a significant amount of Wachovia stock during the Class Period. The Plans' fiduciaries continued to offer Wachovia stock as an investment option and maintain Wachovia stock in the Plans, and even provide a portion of Company Matching Contributions in Wachovia stock, as the stock was plunging in value.  A prudent fiduciary facing similar circumstances would not have stood idly by as the Plans lost billions of dollars.

1. **Background: The Rise and Fall of the Subprime Market and Emergence of the Mortgage and Credit Crises**

96.     During the recent housing boom, interest rates were low, leading to reduced mortgage rates, which attracted more first-time home buyers and persuaded many to refinance their existing loans.  Lenders took advantage of this growing market by originating more loans and introducing "exotic" and nontraditional loan products to appeal to a wider customer base. Lenders also lowered their underwriting standards to capture more market share.

97.     Indeed, in 2004 and 2005, "rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structure and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors" led to an unsustainable, overheated housing market.  *See* Testimony of Sandra L. Thompson, Dir., Div. of Supervision and Consumer Prot., *Fed. Deposit Ins. Corp. on Mortgage Market Turmoil: Causes and Consequences: Hearing Before the S. Comm. on Banking, Housing and Urban Affairs*, 110th Cong. (Mar. 22, 2007) ("Testimony of Sandra L. Thompson") *available at* http://www.fdic.gov/news/news/speeches/archives/2007/chairman/ spmar22071.html.

98.     Subprime mortgage origination volumes surged during the housing boom, growing from $36 billion in 2001 to $390 billion in 2005—accounting for 12.5% of all residential mortgages in 2005.  Brenda B. White, *The Emergence of Alt-A*, Mortgage Banking, Apr. 2006.

99.     When the market inevitably collapsed in 2006, lenders found themselves burdened with vast portfolios of loans made to under-qualified borrowers with little ability to repay.  In response to increased default rates and foreclosures, the credit markets froze in the fall of 2007, resulting in a financial crisis and nationwide recession.

100.     The mortgage and credit crises are rooted in the lax underwriting standards and improper lending practices that were the basis of the subprime and Alternative-A ("Alt-A") lending industries.

### a.     Subprime and Alt-A Lending Fueled the Housing Market.

101.     Loans are classified as "subprime" based on the characteristics of the borrower or characteristics of the loan.  Subprime borrowers are characterized by a greater risk of default, because they have, among other things, a poor credit history, a recorded bankruptcy, or low credit score.  Subprime loans are characterized as riskier loan products, because they include, among other things, an adjustable interest rate, initial payment options that are less than the fully amortized amount of the loan, reduced or no documentation requirements, and high loan-to-value ratio ("LTV") loans, where the borrower puts very little down on the total purchase price.  *See, e.g.*, *Understanding the Subprime Mortgage Crisis* at 6, Proposed Rules for Nationally Recognized Statistical Rating Organizations, 73 Fed. Reg. 36212 n.1.

102.     Alt-A loans, on the other hand, are loans with subprime characteristics that are made to prime borrowers: borrowers associated with the lowest risk of default due to their creditworthy attributes.  Alt-A borrowers commonly are unable to provide documentation of income or assets and/or do not have sufficient financial resources to fit traditional mortgage lending standards.  Thus, the majority of Alt-A loans are originated in the absence of documentation, inspiring many within the industry to refer to them as "liar loans."

103.     Common subprime and Alt-A loans originated during the Class Period include:

- **Stated-income, no-documentation, and low-documentation loans ("liar loans")**: These loans require borrowers to provide little or no documentation and, in some cases, to simply state their income.  No-documentation loans constituted as much as 40% of subprime mortgages originate in 2006.  *See* Gretchen Morgenson, *Crisis Looms in Mortgages*, N.Y. Times, Mar. 11, 2007.

- **Adjustable-rate mortgages ("ARMs")**: ARMs have an initial "teaser" rate that balloons to a much higher, variable rate after the introductory adjustment period ends. By 2005, ARMs accounted for between one-half and one-third of subprime mortgages. *See Mortgage Markets: Hearing Before the S. Comm. on Banking, Housing and Urban Affairs*, 110th Cong. (Mar. 22, 2007) (prepared statement of Roger T. Cole, Dir., Div. of Banking Supervision and Regulation) *available at* http://www.federalreserve.gov/boarddocs/testimony/2007/20070322/default.htm.

- **Option, pay-option, or pick-a-payment ARMs**: These loan products are ARMs that allow borrowers to choose one of four payment options each month: (1) a minimum payment; (2) an interest-only payment; (3) a full principal and interest payment; or (4) an accelerated principal and interest payment.

104. Option ARMs are especially risky because most borrowers choose the least costly payment option—the minimum payment—permitting the borrower to make an artificially low payment that is less than the amount of interest for that month. This creates new debt when the remaining interest is capitalized, a phenomenon known as negative amortization.

105. Option ARMs have proven to be a ticking time bomb, because the minimum payment option contains restrictions: once the principal hits a "negative amortization cap" (typically 120% of the original principal loan amount), the monthly payment automatically reverts to the full principal and interest payment option, requiring the borrower to pay off the new, higher balance over the remaining life of the loan.

106. As ARMs have reset and negative amortization caps have been reached, many borrowers have faced higher payments that they are often unable to afford. Not surprisingly, a higher percentage of ARMs and option ARMs have recently gone into default.

   **b.    MBS and CDOs Fuel the Secondary Market.**

107. In the early 2000s, interest rates were low, making traditional investments in treasury bonds less attractive due to their lower rate of return. Hungry for higher-yielding investments, investors turned to CDOs: a Wall Street invention that offered a higher rate of return but entailed a higher degree of risk.

108.    Wall Street created these CDOs by pooling together asset-backed securities derived from debt obligations—credit card debt, car loan debt, mortgage debt—and dividing the pool into layers called "tranches," which contained varying levels of risk and, therefore, varying rates of return: the higher the level of risk, the higher the rate of return.

109.    The rise in the housing market and resultant explosion in home-loan lending created more MBS, which helped create more CDOs, and thus more investment vehicles for hungry investors.

110.    MBS are created in a similar fashion as CDOs: a lender pools together mortgages it has originated and bought from other lenders into an MBS, divides the MBS into tranches, and then sells the tranches on the secondary market.  Former Treasury Secretary Henry Paulson described this process as "the complex originate-to-distribute securitization model where mortgages [are] sliced and diced then packaged and sold to investors around the world," as demonstrated below.  U.S. Dept. of Treasury, Press Release HP-1070 (remarks by Sec. Henry M. Paulson, Jr. on U.S. Housing Market before FDIC's Forum on Mortgage Lending to Low and Moderate Income Households) (July 8, 2008) *available at* http://www.ustreas.gov/press/releases/ hp1070.htm).



111.    This securitization process allows lenders to move loans off their balance sheets, thereby passing any risk onto investors.

112.    Many lenders and other financial institutions retained interests in the highest-risk tranches of the MBS and CDOs they created.  These retained interests served two purposes: (1) the institutions' willingness to invest in the riskiest tranches provided comfort to credit rating agencies who rated the MBS and CDOs and potential investors who invested in the MBS and CDOs, and (2) institutions were investing in tranches with high potential returns.

113.    There was were significant short-term financial incentives to participate in the originate-to-distribute model: a lender garnered fees at several points throughout the origination and securitization process and often retained mortgage servicing rights, allowing the lender to collect even more fees for retaining the responsibility of collecting payments from borrowers.

All of these fees would then be used to fund the origination of even more loans for securitization and sale, as demonstrated below:



Lender sells MBS: collects proceeds and uses profits to fund more loans

Lender originates mortgages: collects fees

Lender securitizes mortgages into MBS to sell to the secondary market: collects fees

114.    Financial institutions also garnered fees through the process of creating and selling CDOs.

115.    So long as a majority of borrowers made their payments, the originate-to-distribute model remained liquid and highly profitable.  However, if borrowers were to default at higher rates than expected, the model would be disrupted and the negative effects would reverberate throughout the mortgage and financial industries.  This is exactly what began to happen in late 2005 and early 2006 when the housing market contracted and many high-risk borrowers could no longer afford their high-risk loans.

116.    With the housing market cooling, investors lost their appetite for MBS and CDOs, and the secondary market began to evaporate.  By the summer of 2007, the secondary market had frozen, and MBS and CDOs became increasingly difficult, if not impossible, to sell, preventing lenders and financial institutions from moving toxic loans and investment vehicles off their

balance sheets. This led to the freezing of the credit markets in the fall of 2008. For Wachovia, this meant that the Company lost a significant source of funding and could not raise enough capital to balance its books, prompting a fire-sale to Wells Fargo.

### 2. Wachovia: Its Rise and Fall

117. Wachovia's history dates back to the early 1900s. After a number of acquisitions and mergers, the Company grew prominently in 2001 with the $14.9 billion merger of Winston-Salem-based Wachovia Corporation and Charlotte-based First Union Corporation. The combined company had over $200 billion in total assets, becoming one of the largest banks in the United States. Between 2001 and 2006, Wachovia continued to grow through additional acquisitions.

#### a. Wachovia's Overexposure to Risky Subprime Loans and the Contracting Credit Market Precipitates the Company's Near Collapse.

118. Even as the housing market was cooling, Wachovia continued to aggressively grow its mortgage business, moving into riskier markets, lowering its underwriting guidelines, and overexposing the Company to tremendous risk.

##### (i) Wachovia Enters the High-Risk Warehouse Lending Market.

119. In 2005, Wachovia expanded into the wholesale mortgage market—providing warehouse lines of credit to mortgage brokers and independent, non-depository mortgage banks—when it acquired AmNet Mortgage, Inc., the parent company of American Mortgage Network, a wholesale subprime lender. The Company intended to capitalize on profits from underwriting MBS and CDOs by creating its own wholesale division by folding AmNet Mortgage into the Company's existing operations.

120. During 2006-2007, Wachovia produced over $10 billion in CDOs backed by pools of subprime MBS from the Company's wholesale mortgage operation. Unable to sell most

of the CDO tranches due to high rates of default, Wachovia maintained them on its balance sheet at original value, even as MBS indices indicated that these assets were rapidly losing value.

121.    On information and belief, Wachovia did not disclose that it had retained any CDOs until October 2007.  And only in January 2008 did it admit that it had retained $6 billion—*sixty percent*—of these assets.  These holdings included over $2 billion the Company had hedged with entities it knew could not guarantee protection.

122.    During this time period, Wachovia neither created loss reserves for the impending devaluation of its CDO holdings nor marked down the CDOs' value.  When Wachovia, at last, attempted to take precautionary measures in 2008, its loss reserves were insufficient and the securities had lost nearly all their value.

123.    In July 2008, Wachovia finally announced its intention to exit the wholesale mortgage market.

### (ii)    Wachovia Increases Its Subprime Exposure Through the Acquisition of Golden West.

124.    In mid-2006, Wachovia made the surprising decision to acquire Golden West, the second largest thrift in the country, just behind Washington Mutual.  Golden West had $125 billion in assets, almost wholly comprised of high-risk option ARM mortgages.  With the acquisition of Golden West, Wachovia became the fourth largest bank in the United States, behind Citigroup, JPMorgan Chase & Co., and Bank of America.  It also inherited Golden West's $122 billion option ARM portfolio.

125.    Despite the contracting housing market, Defendant Thompson described Golden West as a "crown jewel," stating that the acquisition presented revenue growth opportunities and that Wachovia felt "very, very confident that there [would] be significant revenue synergies." Transcript, *Golden West Financial Corp. Merger Call* at 1, May 8, 2006.

126.    Thompson assured investors that Wachovia had "visited with Golden West and studied their process," and found that "they are obsessed with conservative underwriting" through a "rigorous underwriting process," and as a result, Golden West is "low risk" and "highly efficient." *Id.* at 4. Thompson described Golden West's option ARMs as "elegantly simple" and "low risk." *Id.*

127.    Despite countless reassurances from Wachovia and Golden West executives regarding the acquisition, it was not well received, forcing Wachovia to hold a special, second merger call four days later to ease a number of shareholder and analyst concerns.

128.    With the acquisition of Golden West, Wachovia's loan portfolio grew significantly. The Company gained a $122 billion option ARM portfolio, which represented 29% of its total loan portfolio.

129.    According to Golden West's financial statements and Wachovia and Golden West executive statements, these option ARMs—known as Pick-a-Pay loans—were overperforming at the time of the acquisition. However, the loans soon began defaulting, contravening these statements and resulting in significant losses.

130.    Additionally, after the acquisition Wachovia continued to aggressively market Pick-a-Pay loans, offering mortgage consultants double sales commissions if they steered customers into these loans, and even requiring some consultants to meet a mandatory monthly quota. John W. Schoen, *"Pay Option" Loans Could Swell Defaults*, MSNBC.com, Dec. 10, 2008, *available at* http://www.msnbc.msn.com/id/28035238/.

131.    Wachovia also departed from its underwriting standards throughout the Class Period, approving more borrowers with high LTVs, increasingly lower FICO scores, and/or no documentation of income or assets.

132.     As a result, Wachovia's loan portfolio asset quality indicators deteriorated noticeably in 2007 and devastatingly in 2008.  Provisions for credit losses, the amount of loans written off the books which negatively impact earnings, increased from $434 million in 2006— the year Golden West was acquired—to $2.3 billion in 2007 and up to $22.4 billion in 2008. 2007 Form 10-K at 51; 3rd Quarter 2008 Form 10-Q at 30; Jan. 28, 2009 Form 8-K at Ex. 99.1. During the Class Period, provisions for credit losses increased *51 times*.  *Id.*

133.     And on January 22, 2008, Wachovia disclosed that it was not adhering to its policy of writing down the value of its option ARMs on a 180 day overdue basis.  Instead, Wachovia recognized charge-offs of it option ARM mortgage pool after an actual property sale, resulting in a time period much greater than the previously stated 180 day policy.  This disclosure resulted in a sudden increase in recognized nonperforming option ARMs.

134.     In its last quarter as an independent entity, Wachovia experienced "$37.2 billion of credit write-downs . . . on $93.9 billion of high risk loans (primarily Pick-A-Pay and commercial real estate loans)."  Wells Fargo Current Report (Form 8-K/A) (Jan. 28, 2009) at Ex. 99.1.

135.     Many Defendants acknowledged that the acquisition of Golden West was a serious mistake with far-reaching consequences.  *See generally*, Valerie Bauerline, *New Chief Plots Wachovia Overhaul—Dumping Loans Among Possibilities; 'Execute Like Crazy'*, Wall St. J., July 11, 2008.  "[O]bviously [Wachovia] didn't take a close enough look at Golden West. . . . [T]he lender's adjustable-rate mortgages, which let borrowers skip payments and add the unpaid interest on the principal, were a formula for disaster by anyone's standard."  David Mildenberg, *Wachovia Posts Loss, Plans $7 Billion Capital Raising*, Bloomberg, Apr. 14, 2008.

136. Len Blum, an investment banker at Westwood Capital, described Wachovia's option ARM portfolio as "a real problem," because "Option ARMs are probably the worst mortgage products out there and Wachovia has a lot more of them than it has in tangible equity." Ben White & Eric Dash, *Wachovia, Looking for Help, Turns to Citigroup*, New York Times, Sept. 27, 2008.

137. Upon acquiring Wachovia, Wells Fargo disclosed that it was writing down Wachovia's loan portfolio by a further $66 billion; 13% of the total loan portfolio. And of that, Golden West's option ARM portfolio accounted for $32 billion—nearly half—of the write down: more than the Company's combined earnings over its last 21 profitable quarters.

>    (iii)    **Overexposed to and Dependent on the Subprime and Credit Markets, Wachovia's Troubles Continue.**

138. On January 22, 2008, Wachovia disclosed that it was not adhering to its policy of writing down the value of its option ARMs on a 180 day overdue basis. Instead, Wachovia recognized charge-offs of the option ARM mortgage pool after an actual property sale, which resulted in a time period much greater than the aforementioned 180 day policy. The disclosure of this discrepancy resulted in a sudden increase in recognized nonperforming option ARMs.

139. In 2008, Wachovia experienced massive losses. Although Defendant Thompson repeatedly affirmed that Wachovia "wouldn't need to cut its dividend or raise additional capital," the Company was forced to "slash[] the dividend by 41% in April and move[] to raise $8 billion." Valerie Bauerlein & David Enrich, *Wachovia Board Ousts CEO as Bank's Missteps Mount—Thompson Faulted for Response to Credit Woes, Stock Slump*, Wall. St. J., June 3, 2008.

140. In June 2008, Defendant and CEO Thompson was forced to resign, after seven years as CEO and over 30 years at the Company. Thompson's resignation was due, in part, to

the disastrous acquisition of Golden West and resultant credit loss and because "Thompson was slow to acknowledge how seriously the bank's credit profile was deteriorating." *Id.*

141. Thompson's resignation raised red flags: "This is a sign that Wachovia hasn't stabilized. . . . The fact that they decided to essentially terminate him is a sign that there's more bad news to come. There's going to be more write downs." Tomoeh Murakami Tse, *Wachovia Ousts Top Executive; Banks' Trouble Continue to Mount*, Washington Post, June 3, 2008.

142. After Thompson's forced resignation, Wachovia hired Goldman Sachs to review its troubled loan portfolio after continued losses. The mortgage portfolio remained analysts' biggest concern. *Id.*

143. In July 2008, Defendant Steel, then undersecretary of the Treasury, replaced Defendant Thompson as CEO. At the time, it was widely recognized that Steel was brought in to downsize the company to reduce risk and avert a total collapse. At the time, Wachovia's chairman opined that there had been "a complete recognition at the board level that Golden West was a mistake, and [they] had to deal with the consequences of it." Valerie Bauerline, *New Chief Plots Wachovia Overhaul—Dumping Loans Among Possibilities; 'Execute Like Crazy'*, Wall St. J., July 11, 2008. An analyst "warned that [Wachovia] . . . will face two years of losses arising from the credit crisis and a dramatic restatement of troubled assets on its books." David Cho & Renae Merle, *Wachovia Faces Shallow Reserves But Says It Is Raising More Capital,* Washington Post, July 16, 2007.

144. Even with a new CEO, on July 16, 2008, "Wachovia's stock fell to a 17-year low," after a "grim report" from a stock analyst which cited "the biggest issue for Wachovia is the allowance for loan losses" which was too small compared to what probable future losses would turn out to be. *Id.* In addition, the analyst believed that "[e]ither management was

blindsided by the losses or they knew that there were losses that would come through the pipeline and they chose not to properly accrue for those losses." *Id.*

145.    As financial markets worsened and credit markets continued to tighten, trouble mounted exponentially on September 15, 2008, when Lehman Brothers, a Wall Street investment bank filed for bankruptcy.  On that day, Defendant Steel appeared in an interview on Jim Cramer's *Mad Money* television program to ease concerns surrounding Wachovia, whose share price was down significantly during trading that day.  *See Mad Money with Jim Cramer* (CNBC television broadcast Sept. 15, 2008), http://www.cnbc.com//id/26720573 and http://www.cnbc.com//id/26720574.

146.    Steel explained to Cramer that the Company's total loan portfolio exposure was only $10 billion and that Wachovia had "a great future as an independent company."  *Id.*

147.    This proved false as less than two weeks later, Wachovia faced the choice of filing for bankruptcy or being sold to a competitor in a forced sale.

148.    On September 26, 2008, Wachovia entered into Confidentiality Agreements with Citigroup and Wells Fargo for a possible acquisition.

149.    The next week, after Wells Fargo initially backed out the weekend before and Citigroup appeared to have finalized its bid for Wachovia, Wachovia was approached on October 2, 2008, by Wells Fargo with a far superior offer for the whole Company, which Wachovia accepted.  Upset by this transaction, Citigroup pursued litigation against Wachovia.  In an affidavit regarding the litigation, Defendant Steel stated in relevant part how critical the situation was during Wachovia's last days:

> [FDIC] Chairman Bair confirmed that in the FDIC's view [Wachovia's] situation posed a systemic risk to the banking system, and that the FDIC was prepared to exercise its powers under Chapter 13 of the Federal Deposit Insurance Act to effect an open bank assisted transaction.

Subsequently, Chairman Bair directed Wachovia to commence negotiations.

*Wachovia Corp. v. Citigroup, Inc.*, No. 08-08503 (S.D.N.Y. Oct. 6, 2008), Aff. Robert K. Steel, at 2 & 3.

150.    Wells Fargo acquired Wachovia for $15.1 billion; a severe discount from the Company's stated value of over $75 billion in its second-quarter 2008 report and almost half of what the Company paid for Golden West in 2006.  *See* 2nd Quarter 2008 Form 10-Q at 79.  The discounted price Wells Fargo paid for Wachovia reflected the great risk it was taking related to poor performing loans on Wachovia's balance sheet.  Loans that Wells Fargo initially wrote down by $65 billion.

151.    After the completion of the fire-sale, Wells Fargo disclosed it would write down $65 billion of Wachovia's loan portfolio—a significant increase from the $10 billion exposure Defendant Steel had described a mere two weeks earlier on *Mad Money*.

> **b.      Wachovia's Overreliance on Inadequate Risk Management and Accounting Practices Inflates the Company's Stock Price and Introduces Another Layer of Risk.**

152.    As high-level executives, Defendants were responsible for Wachovia's risk management function:

> Our risk governance structure begins with our board of directors, which evaluates risk and oversees the management of risk through its Risk Committee and its Audit Committee.
>
> The board of directors has approved management accountabilities and supporting committee structures, headed by management's senior risk committee, to effect risk governance. Our chief executive officer is responsible for the overall risk governance structure. Our chief risk officer reports directly to our chief executive officer and is responsible for independent evaluation and oversight of our credit, market and operational risk-taking activities and our risk governance processes.
>
> We oversee strategic business risk and our general business affairs through the Operating Committee. This committee meets monthly and is composed of the

senior management of the company, including all executives who report directly to the chief executive officer.

2007 Form 10-K at 38;

153.     Wachovia's considerable risk-taking was not adequately disclosed in its financial statements.  Instead, Wachovia described strong, efficient, and responsive risk management procedures and oversight:

> Our risk management organization provides objective oversight of our risk-taking activities and translates our overall risk appetite into approved limits. Risk management works with the business units and functional areas to establish appropriate standards and also monitors business practices in relation to those standards. Risk management proactively works with the businesses and senior management to ensure we have continuous focus on key risks in our businesses and emerging trends that may change our risk profile.

2007 Form 10-K at 38;

154.     The 10-Ks include discussion of seven key aspects of risk:

(1)     **Credit Risk** - the risk of loss due to adverse changes in an issuer's, borrower's or counterparty's ability to meet its financial obligations under agreed upon terms.  This unit reports directly to the chief risk officer and to the Risk Committee of the board of directors.

(2)     **Commercial Credit** - All commercial exposures, both in the form of loans and commitments to lend, are assigned internal risk ratings that reflect the probability of borrower default on any obligation and the probable loss in the event of a default.

(3)     **Retail Credit** - In retail lending, we manage credit risk primarily from a portfolio view. The risk management division, working with the lines of business, determines the appropriate risk and return profile for each portfolio, using a variety of tools including quantitative models and scorecards tailored to meet our specific needs.  In retail lending, we manage credit risk primarily from a portfolio view. The risk management division, working with the lines of business, determines the appropriate risk and return profile for each portfolio, using a variety of tools including quantitative models and scorecards tailored to meet our specific needs.

(4)     **Market Risk** - Market risk represents the risk of declines in value that on- and off-balance sheet positions could realize depending on a variety of market movements, such as changes in interest rates, equity prices and foreign exchange rates.

Market risk management activities are overseen by an independent market risk group, which reports outside the business units to the risk management group. Risk measures include the use of value-at-risk (VaR) methodology with limits approved by the market risk committee and subsequently by the Risk Committee of the board of directors. The market risk committee also approves a variety of other trading limits designed to match trading activities to our appetite for risk and to our strategic objectives.

(5) **Operational Risk** - Operational risk is the risk of loss resulting from inadequate or failed internal processes, people and systems or from external events.

Operational risk is managed through an enterprise-wide framework for organizational structure, processes and technologies. This framework is maintained by an independent operational risk team that reports to the risk management group.

(6) **Liquidity Risk** - Liquidity risk involves the risk of being unable to fund assets with the appropriate duration and rate based liabilities, as well as the risk of not being able to meet unexpected cash needs. In our liquidity management process, we focus on both assets and liabilities and on the manner in which they combine to provide adequate liquidity to meet our needs.

The asset and liability committee is responsible for liquidity risk management. This committee approves liquidity limits and receives thorough periodic reports on our liquidity position. Liquidity reports detail compliance with limits and with guidelines. They include a review of forecasted liquidity needs based on scheduled and discretionary asset and liability maturities. They evaluate the adequacy of funding sources to meet these needs. In addition, stress tests are evaluated to determine required levels of funding in an adverse environment as was the case during the second half of 2007. These stress tests include reduced access to traditional funding sources in addition to unexpected draw-downs of contingent liquidity exposures.

(7) **Interest Rate** - One of the fundamental roles in banking is the management of interest rate risk, or the risk that changes in interest rates may diminish the net interest income we earn on loans, securities and other earning assets. Our policy is to limit the risk we can take through balance sheet management actions to 5 percent of earnings per share in both falling and rising rate environments.

2007 Form 10-K at 38-43;

        **(i)**      **Wachovia's Risk Modeling Was Inaccurate and Faulty.**

155.     The Market Risk sections of Wachovia's financial statements describe the Company's use of modeling to value its assets as well as Value-at-Risk ("VaR") modeling practices to determine potential risk to the entity.

156.     VaR modeling is based on probability and statistics and was "developed and popularized in the early 1990s by a handful of scientists and mathematicians . . . who went to work for J.P.Morgan" and started JPMorgan's spin off RiskMetrics.  Joe Nocera, *Risk Mismanagement*, N.Y. Times, Jan. 4, 2009.  VaR expresses risk as a dollar figure.  VaR is not a single standardized model—rather, it is a "group of related models that share a mathematical framework."  *Id.*  Thus, different firms use different versions of VaR.  VaR assumes "normal" market conditions and purports to measure—in the extreme short term—the chances that a portfolio or an entire company will *not* lose more than a particular amount of money in a given time frame.  *Id.*  For example, a 95% daily VaR of $30 million means that there is a 95% chance that the entity will not lose more than $30 million in a day.  What can happen in the other five percent realm is anyone's guess.

157.     VaR became popular with institutions such as Wachovia, particularly as the SEC began to require a quantitative disclosure of market risks in financial statements.  The SEC did not, however, standardize VaR among these institutions or audit their formulas.  *See id*.

158.     However, VaR is seriously flawed for several reasons, including:

- VaR does nothing to predict catastrophic events, such as the one percent or five percent scenarios it does not quantify, and the housing bubble's expansion in 2005 and 2006 was utterly useless in predicting what would happen in 2007 and 2008 when the bubble burst.  *See* Nocera, *supra*; *see also* Yves Smith, *Woefully Misleading Piece on Value at Risk in New York Times*, nakedcapitalism.com, Jan. 4, 2009 (describing skewed negative outcomes);

- VaR uses historical and/or "normal" market inputs and ignores the unpredictable or unprecedented. VaR is based on a bell curve, but what is in the tails is the catastrophic loss of billions—what author Nassim Nicholas Taleb calls "fat tails" or "black swans."[3] Moreover, VaR failed to distinguish between leverage based on long-term debt and leverage based on overnight repo loans. Nocera, *supra*;

- VaR does not contemplate a changing world, much less unlikely events in a changing world. James Kwak, *Risk Management for Beginners*, baselinescenario.com, Jan. 4, 2009 (distinguishing "extreme events" typically left out of historical VaR from the entirely separate problem of a changed world where both normal and abnormal events are left out of the entire VaR equation);

- VaR uses valuation inputs that are not capable of being marked to the market. An instrument that is traded infrequently—or never—cannot be objectively valued. Putting a value that is estimated based on a comparable security into VaR as one of thousands of variables means that VaR has an even lower chance of accurately gauging risk; and

- VaR can be gamed. Once banks started reporting VaR, they began to manipulate it. One way of gaming VaR is using "asymmetric risk positions" such as credit default swaps ("CDS"), where the income the position generates is steady and small and the gains are included in VaR results. However, because the risk of having to pay off CDS insurance was "assumed to be miniscule," that enormous loss was outside the probability that VaR measured. In other words, the downside of the gamble resided in the "fat tail" and was essentially hidden from view. Another way to game VaR is through the use of options, including put options—transactions that leave VaR unchanged. Nocera, *supra*.

159. Wachovia describes the purpose of its VaR models as being an assessment of "market volatility over the most recent 252 trading days to estimate within a given level of confidence the maximum trading loss over a period of time that we would expect to incur from an adverse movement in market rates and prices over the period," and "is additionally supplemented by stress testing on a daily basis." 2007 Form 10-K at 39. Yet, Wachovia's models were faulty—and unable to serve their stated purpose—for several reasons: (a) they were based on *historical* data; (b) they disregarded huge swaths of risk due to exclusion of

---

[3] In addition, while VaR is based on a standard bell curve, the mathematical models do not track the bell exactly. For example, financial markets are subject to "skewness"—which means results are not symmetrical around the mean—and "kurtosis"—which means that "fat tails" encompass events that are "more likely to happen [than] a normal distribution would suggest." Smith, *Woefully Misleading*, *supra*.

market-value data; (c) they incorporated Wachovia's skewed asset valuations, such as valuations for Level 2 and 3 assets, and therefore constituted a doubly-unreliable gauge of the Company's risk; and (d) they were developed and revised by Wachovia alone, and accordingly lacked any external verification or corroboration.

160.    Wachovia represented that "[e]ach instance in which the VaR limit was exceeded was approved either by our chief risk officer or by our market risk committee, which includes our chief risk officer and chief financial officer." *Id*. at 71.  However, Wachovia's VaR models were severely out of date.  Moreover, the VaR methodology used by Wachovia was grossly out of sync with any reasonable incorporation of the risk of a housing market collapse.  The use of historical pricing models was not a prudent way to reduce risk.  Rather, it increased risk and encouraged Wachovia as it benefited from the housing boom, because during the upside of the housing bubble, Wachovia's historical pricing models served to justify its business practices and reinforce the false belief that a correction would not be severe, but if it were to occur it would be moderate.  During the housing bust, Wachovia used the very same shoddy pricing models to postpone the disclosure of its true loss exposure to risky financial instruments.

161.    Finally, the numbers Wachovia produced with its VaR model were strikingly low, suggesting that Wachovia had low risk exposure relative to the size of its operation.  The average aggregate daily value at risk increased from $30 million in 2006 to $62 million in 2007.  Wachovia attributed this increase to "the consolidation of a structured lending vehicle." *Id*. at 39.  In its last earnings release before its sale to Wells Fargo, Wachovia reported daily value at risk of only $65 million.

162.    Wachovia's true daily value at risk was high in both 2006, 2007, and 2008—likely much higher than $65 million—and the increase as 2007 and 2008 wore on likely was much starker than these numbers suggest.  Indeed, Wachovia's actual losses far exceeded these numbers—an unsurprising result given the unreliability of VaR to predict low-probability but high-stakes losses.  Wachovia's use of and reliance on VaR was flawed both because the models were incapable of accurately projecting risk and because VaR was not accompanied by adequate quantitative and qualitative analysis.

163.    Wachovia's "Risk Factors" sections in 10-K filings did not touch on the unreliability of VaR, a material risk factor.  There were no warnings of the ultimate failure in its VaR systems, procedures, and model input inaccuracies.

164.    Wachovia's risk management procedures were unreliable, in part because they relied too heavily on faulty VaR calculations created by internally created computer models based on underlying economic and market factors that maximized Wachovia's gains and minimized its losses, and the Plans' fiduciaries—who oversaw Wachovia's risk management infrastructure, who ran the Company, and who signed and prepared the financial statements—knew it.

**(ii)    Wachovia Violated Accounting Principles and Standards.**

165.    Generally Accepted Accounting Principles ("GAAP") are the conventions, rules and procedures recognized by the accounting profession as necessary to define accepted accounting practices at a particular time.  The SEC has the statutory authority to promulgate GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB") and the American Institute of Certified Public Accountants ("AICPA").  SEC Regulation S-X (17 C.F.R. § 210.4-01(a) (1)) provides that financial

statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

166.    Wachovia violated GAAP to keep investors, creditors, and others, including participants and beneficiaries of the Plans, in the dark about the true nature and extent of its concentration of credit risk in its loan portfolio on- and off-balance sheet, primarily related to its risky option ARMs.  Similarly, Wachovia violated GAAP by not properly accounting and reporting for adequate allowance for loan losses and reporting inflated, inaccurate valuations of loans and securities.  It is clear that Wachovia used accounting form over substance and economic reality.  In particular, Wachovia violated GAAP in the financial statements through the misuse of:

- Statement of Financial Accounting Standard No. 107 (SFAS 107), *Disclosures about Fair Value of Financial Instruments*, requires that significant amounts of credit risk concentration that may present adverse material effects to the company be disclosed in the body of the financial statements.  Wachovia provided an inadequate amount of information, withholding pertinent and critical information for an investor to make a sound decision;

- Statement of Financial Accounting Standard No. 114 (SFAS 114), *Accounting by Creditors for Impairment of a Loan*, requires that loans be valued based on the present value of expected discounted future cash flows or its fair value.  Wachovia materially overstated the value of its loans in its loan portfolio, especially in respect to the option ARMs.  The violation of this accounting standard by Wachovia impaired investors decision making process;

- Statement of Financial Accounting Standard No. 115 (SFAS 115), *Accounting for Certain Investments in Debt and Equity*, by significantly inflating the value of certain securitized assets on its balance sheet;

- Statement of Financial Accounting Standard No. 157 (SFAS 157), *Fair Value Measurements*, which defines fair value, establishes a framework for measuring fair value and requires enhanced disclosures about fair value measurements.  The expanded disclosures are intended to allow investors, creditors, and others to understand how Wachovia measures recognized assets and liabilities, the inputs used to develop the measurements, and the effect of the measurements on earnings during a period.  Wachovia significantly inflated the fair value of its MBS and similar financial instruments by using unrealistic valuation models without adequately disclosing the assumptions and valuation models applied.  By

not adequately using fair value disclosures for those assets under SFAS 157, Wachovia misled investors, creditors, and others by withholding critically important facts and assumptions;

- Statement of Financial Accounting Standard No. 140 (SFAS 140), *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*, relating to derecognizing off-balance sheet entities and treating the transfer of assets as true sales. Off-balance sheet entities were used by Wachovia to increase sales and revenues during the housing boom, while during the housing bust they were used to hide losses and ignore the substance of the transactions;

- FASB Interpretation No. 46 (FIN 46), *Consolidation of Variable Interest Entities*, by not consolidating all eligible off-balance sheet entities of which it was the primary beneficiary. The off-balance sheet entities that were consolidated by Wachovia understated the exposure to loss and withheld critical assumptions and facts from the financial statements;

- Statement of Financial Accounting Standard No. 142 (SFAS 142), *Goodwill and Other Intangible Assets*, for not disclosing an impairment of goodwill in a timely manner. The Company's excessive premium paid for Golden West's troubled option ARM portfolio in 2006 was apparently impaired much sooner than it disclosed in its financial statements, a violation of SFAS 142; and

- Statement of Financial Accounting Standard No. 5 (SFAS 5), *Accounting for Contingencies*, by not immediately notifying the public in an 8-K filing that a material future loss was probable in the outcome of.

167. As a result of the above, investors, creditors, and others, including participants and beneficiaries of the Plans, were unable to properly assess the true value of Wachovia stock, causing it to become artificially inflated during the Class Period.

168. Wachovia also neglected the basic tenets of financial accounting described in *Qualitative Characteristics of Accounting Information* in Statement of Financial Accounting Concepts No. 2:

- Bias—Bias in measurement is the tendency of a measure to fall more often on one side than the other of what it represents instead of being equally likely to fall on either side. Bias in accounting measures means a tendency to be consistently too high or too low;

- Comparability—The quality of information that enables users to identify similarities in and differences between two sets of economic phenomena;

55

- Completeness—The inclusion in reported information of everything material that is necessary for faithful representation of the relevant phenomena;

- Conservatism—A prudent reaction to uncertainty to try to ensure that uncertainty and risks inherent in business situations are adequately considered;

- Consistency—Conformity from period to period with unchanging policies and procedures;

- Feedback Value—The quality of information that enables users to confirm or correct prior expectations;

- Materiality—The magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement;

- Neutrality—Absence in reported information of bias intended to attain a predetermined result or to induce a particular mode of behavior;

- Predictive Value—The quality of information that helps users to increase the likelihood of correctly forecasting the outcome of past or present events;

- Relevance—The capacity of information to make a difference in a decision by helping users to form predictions about the outcomes of past, present, and future events or to confirm or correct prior expectations;

- Reliability—The quality of information that assures that information is reasonably free from error and bias and faithfully represents what it purports to represent;

- Representational Faithfulness—Correspondence or agreement between a measure or description and the phenomenon that it purports to represent (sometimes called validity);

- Timeliness—Having information available to a decision maker before it loses its capacity to influence decisions;

- Understandability—The quality of information that enables users to perceive its significance; and

- Verifiability—The ability through consensus among measurers to ensure that information represents what it purports to represent or that the chosen method of measurement has been used without error or bias.

Statement of Financial Accounting Concepts No. 2, *Qualitative Characteristics of Accounting Information*, at 6.

### (iii) Wachovia's Internal Controls Were Deficient.

169. Wachovia's management, including Defendants Thompson and Steel, as the

CEO, and Defendant Wurtz, as the CFO, evaluated and maintained internal control over

financial reporting. Defendants in CEO and CFO roles signed the Management Report on

Internal Control Over Financial Reporting required by Sections 404 and 302 of the Sarbanes-

Oxley Act of 2002. The 2007 10-K asserts in relevant part:

> Management of Wachovia Corporation and subsidiaries (the "Company") is
> responsible for establishing and maintaining effective internal control over
> financial reporting. Internal control over financial reporting is a process designed
> to provide reasonable assurance regarding the reliability of financial reporting and
> the preparation of financial statements for external purposes in accordance with
> U.S. generally accepted accounting principles.

2007 Form 10-K at 68.

170. As described in detail above, Wachovia's risk management procedures and

financial statement reporting were grossly inadequate. As such, the foregoing certifications

were false and misleading.

### B. Defendants Knew or Should Have Known That Wachovia Stock Was an Imprudent Investment.

171. Given the facts described above, it is clear that since the beginning of the Class

Period, the Company's stock was an imprudent investment for the Plans because of, among other

things, the Company's: (1) reckless concentration on loan production in spite of the declining

mortgage market; (2) failure to limit its exposures and risks especially with respect to the

acquisition of Golden West; (3) failure to accurately account for its high-risk mortgage and CDO

holdings; (4) the Company's imprudent loan underwriting practices and reliance on inadequate

risk management and accounting practices; and (5) Wachovia's repeated misrepresentations of

the Company's true financial condition, all of which caused Wachovia's financial statements to

be misleading and artificially inflated the value of the Wachovia stock in the Plans and ultimately led to the collapse of the Company.

### 1. Defendants Knew the Company Was at Risk and that Company Stock Was Imprudent Due to the Company's Improper Business Practices.

172. As previously mentioned, Wachovia claimed to have higher lending standards and risk management practices than other banks and mortgage lending institutions that were failing or writing off billions in bad loans. Yet most of this was an illusion. Wachovia was overleveraged, insufficiently capitalized, and deeply mired in a risky mortgage-dependent origination and securitization business, churning out and retaining on its books increasing amounts of "toxic assets," which it overvalued with its self-serving valuation models and in turn used to understate risk to the entire entity.

173. All of this came to a screeching halt in September 2008 when Wachovia was acquired in a forced sale to Wells Fargo. Warning signs abounded beginning with the subprime housing bust in late 2006, and the signs only grew from there.

174. Prudent risk management practices and proper internal controls could have prevented the Company's near collapse that necessitated a fire-sale. That Wachovia's downfall was accompanied by a growing global financial crisis—to which Wachovia in fact contributed—does not make Defendants any less accountable for their reckless behavior.

175. The problem with Wachovia's management was not a matter of not knowing the consequences of their actions or being blindsided by a "run on the bank." On the contrary, Wachovia's problems grew directly and predictably from poor leadership, strategy, and execution at the most senior level. Instead of heading off a disaster, Wachovia's executives and its Board—fiduciaries of the Plans—forged full force into the pursuit of lucrative winnings from risky investments and a deeply flawed business model. To do this, Wachovia and its leaders had

to ignore numerous and persistent red flags throughout the Class Period while all indicators, real and projected, would have led any prudent fiduciary to change course and protect the Plans' assets from obliteration.

176.    Given the facts described herein, based on their positions within the Company, Defendants Langley, Smith, Steel, Thompson, and Wurtz—as well as Wachovia—knew, and based on their positions within the Company the remaining individual Defendants knew or should have known, that Wachovia stock was an imprudent investment for the Plans' assets based on all of the facts alleged herein.

177.    Further, there is evidence that all Defendants had substantial warnings of the impending subprime crisis because as early as 2006 the imminent collapse of the subprime lending industry was widely documented.

**2.    Published Warnings and Red Flags Place the Plans' Fiduciaries on Notice of the Need to Investigate Risks at Wachovia.**

178.    In late 2004 and early 2005, industry watchdogs began expressing growing fears that relaxed lending practices had increased "risks for borrowers and lenders in the overheated housing markets."  Ruth Simon, *Mortgage Lenders Loosen Standards – Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005, at D1.

179.    Between February and March of 2005, properties in foreclosure available for sale jumped 50%.  Janet Morrissey, *Home Foreclosure Listings Surged in March, Study Shows*, A.P., Apr. 7, 2005.  And new foreclosure inventory rose in 47 out of 50 states—signifying a "national trend."  Michele Derus, *Foreclosures Jump 57% from Last Year; Higher Interest Rates, Job Losses are Cited*, Milwaukee J. Sentinel, Apr. 7, 2005, at D1.

180.     Indeed, trouble in the housing market emerged in 2005 when home values began to decline and the Federal Reserve instituted a series of interest rate hikes that caused interest rates on variable rate loans, including mortgage loans, to rise.  In response, "bank regulators issued their first-ever guidelines for credit-risk management for home-equity lending" in May 2005.  Simon, *Mortgage Lenders Loosen Standards, supra*.

181.     As of mid-2005, delinquency rates for subprime loans (60-days or more past due) rose for the first time since 2002.  By the fourth quarter of 2005, delinquencies and foreclosures began to rise even more severely—as of October 2005 the delinquency rate was twice that recorded on new subprime loans a year earlier.  Ruth Simon & James R. Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006.

182.     In July 2005, the Center for Economic and Policy Research described the risks of a housing bubble collapse in terms of the effect on mortgage holders—and holders of MBS.  The report explained that the "collapse of the housing bubble is likely to lead to record levels of mortgage defaults" that would cause the MBS market, which "now exceeds $6 trillion . . . [to] be put in danger by a large wave of defaults following the collapse of the housing bubble."  Dean Baker, *Ctr. for Econ. & Pol'y Research, Issue Brief: The Housing Bubble Fact Sheet* 3-4 (July 2005).  The report concluded that "[i]t is likely that the federal government will have to bail out the market in mortgage-backed securities to prevent a cascading series of defaults."  *Id.*

183.     Nonetheless, on July 26, 2005, the *Wall Street Journal* warned that "[m]ortgage lenders are continuing to loosen their standards, despite growing fears that relaxed lending practices could increase risks for borrowers and lenders in overheated housing markets."  Simon, *Mortgage Lenders Loosen Standards, supra*.

184.     In September 2005, the *Wall Street Journal* reported that "bank regulators [were] sounding the alarm bells about rising risks in the mortgage market."  Ruth Simon & James R. Hagerty, *Mortgage Lenders Tighten Standards*, Wall St. J., Sept. 29, 2005.  The then Federal Reserve Chairman Alan Greenspan testified that "the apparent froth in housing markets may have spilled over into mortgage markets" and stated that the "dramatic increase" in interest-only mortgages and "more exotic forms of adjustable rate mortgages" were "developments that bear close scrutiny."  *Id.*  Some lenders moved to curtail the availability of new mortgage products such as ARMs and interest-only loans.  *Id.*

185.     The risks of option ARMs—including Wachovia's Pick-A-Pay loan product— were also identified by industry watchdogs.  As reported in November 2005, "[r]egulators have raised concerns about the risks of these complex loans and whether borrowers truly understand them."  Ruth Simon, *A Trendy Mortgage Falls from Favor – Demand for Option ARMS, Which Helped Fuel Boom, Wanes Amid Rising Rates, Growing Risk,* Wall St. J., Nov. 29, 2005.

186.     According to the FDIC, total subprime delinquencies rose from 10.33% in the fourth quarter of 2004 to 13.33% in the fourth quarter of 2006, and foreclosures rose from 1.47% to 2.0% over the same period.  Testimony of Sandra L. Thompson, *supra.*

187.     ARM subprime loans accounted for the largest rise in delinquency rates, an increase from 9.83% to 14.44% between the fourth quarter of 2004 and the fourth quarter of 2006; foreclosures rose from 1.5% to 2.7% during the same period.  *Id.*  In 2006 alone, roughly 80,000 subprime borrowers fell into delinquency, many shortly after origination.  Simon & Hagerty, *More Borrower With Risky Loans Are Falling Behind*, *supra.*

188.     By the beginning of 2006, the housing bubble had finally burst.  *See* Paul Krugman, *No Bubble Trouble?*, N.Y. Times, Jan. 2, 2006;  *see also* Shawn Tully, *Welcome to the*

*Dead Zone*, Fortune, May 5, 2006.  The Case-Shiller Price Index illustrates the bubble and bust

expressed as year-over-year change in the Composite 10 and Composite 20 indices:



189.    Nonetheless, the media reported that nontraditional mortgages were growing even

riskier throughout 2006 as lenders originated a large number of "liar loans."  *See, e.g.*, Gretchen

Morgenson, *Crisis Looms In Market for Mortgages*, N.Y. Times, Mar. 11, 2007, at 1.

190.    On October 4, 2006, the bank regulators issued their final guidelines for mortgage

lenders.  *See* Office of the Comptroller of the Currency Board of Governors of the Federal

Reserve System, *Interagency Guidance on Nontraditional Mortgage Products Risks,* Oct. 4,

2006, http://www.occ.treas.gov/fr/fedregister/71fr58609.pdf.

191.    By the end of 2006, industry experts forecast the imminent collapse of the

subprime lending industry.  On December 20, 2006, the Center for Responsible Lending issued a

report predicting the worst foreclosure crisis in the modern mortgage market.  Ron Nixon, *Study

Predicts Foreclosure for 1 in 5 Subprime Loans*, N.Y. Times, Dec. 20, 2006, at C1.  Shortly

thereafter, several major mortgage lenders disclosed extraordinary rates of loan defaults, triggering inquiries from the SEC and FDIC, and resulting in several bankruptcy filings. *Id.*

192.    Investors had also become wary of MBS. "[H]edge funds that specialize in MBS had an outflow of $1.8 billion in 2006, down from an inflow of $1.8 billion in 2005." Vikas Bajaj & Christine Haughney, *Tremors at the Door*, N.Y. Times, Jan. 26, 2007.

193.    On January 3, 2007, Consumer Affairs warned that "as the housing market slows to a crawl, many subprime lenders are collapsing faster than homes made of substandard materials, and the signs point to even more pain in the housing market as a result." Martin H. Bosworth, *Subprime Lender Implosion: Bad Omen For Housing Market*, ConsumerAffairs.com, Jan. 3, 2007.

194.    Worries about a wave of defaults were confirmed in February 2007, when the second largest U.S. subprime mortgage lender, HSBC Holdings PLC, announced "a substantial increase in [its] provision for loan losses with respect to the Mortgage Services operations in the fourth quarter," and that the "loan impairment charges and other credit risk provisions for 2006 [would] exceed the current market consensus estimate of $8.8 billion by 20 percent." Hagerty & Hudson, *supra*; *see also* HSBC Feb. 2007 Form 8K at Ex. 99.

195.    An HSBC executive acknowledged that the company had "made some decisions that could have been better." Carrick Mollenkamp, *Faulty Assumptions: In Home-Lending Push, Banks Misjudged Risk—HSBC Borrowers Fall Behind on Payments; Hiring More Collectors*, Wall St. J., Feb 8, 2007, at A1.

196.    The market consensus was that CDOs of subprime residential mortgage backed securities were "going to zero." *See, e.g.*, Jody Shenn & Shannon D. Harrington, *Subprime Mortgage Derivatives Extend Drop on Moody's Reviews*, Bloomberg, Feb. 22, 2007; Jody

Shenn, *Subprime Mortgage Bond Risks Rise, Credit Derivatives Show*, Bloomberg, Feb. 23, 2007.

197.     As demonstrated in the graph below, in just one month—February 2007—the ABX Home Equity Index (ABX.HE), a synthetic index of U.S. home equity asset-backed securities, dove from the 80-90 percent range to the 60-70 percent range. *Hedge Funds Profit Off Subprime Collapse—Funds Benefit from Decline in ABX Index*, Hennessee Group LLC, Aug. 21, 2007, *available at* http://www.hennesseegroup.com/releases/release20070821.html.



*Id.*

198.     On February 16, 2007, Standard &Poor's ("S&P") announced that it would no longer wait for foreclosures before downgrading associated MBS. Bloomberg News, *S&P to Speed Mortgage Warnings; The Ratings Company, Responding to Rising Delinquencies, Will Alert Bond Investors Before Foreclosures Occur*, L.A. Times, Feb. 16, 2007, at 1. An S&P analyst commented that the agency had "equal concerns" about Alt-A loans and subprime loans based on early delinquencies. *Id.*

199.    Indeed, risks related to subprime and Alt-A mortgages were a topic of much press

coverage by early 2007.  *See* Gretchen Morgenson, *Will Other Mortgage Dominoes Fall?*, N.Y.

Times, Feb. 19, 2007 (discussing strain in the Alt-A sector of the CDO market); Chris Isidore,

*"Liar Loans" Mortgage Woes Beyond Subprime*, CNNMoney.com, Mar.19, 2007 (describing

how growth of Alt-A had surpassed subprime and underpinned much of the real estate boom in

2004 and 2005).

200.    In late March 2007, "Moody's Investors Services warned . . . that defaults and

downgrades of subprime MBS could have 'severe' consequences for CDOs that invested heavily

in the sector."  Alistair Barr, *Mortgage Crisis to Hit Holders of Risky Derivatives*, MarketWatch,

Apr. 2, 2007.

201.    In the first nine months of 2007, "at least 90 [subprime] lenders [had] gone out of

business."  Darryl E. Getter, Mark Jickling, Marc Labonte, & Edward V. Murphy, *Gov't & Fin.*

*Div., Cong. Research Serv., CRS Report for Congress: Financial Crisis? The Liquidity Crunch*

*of August 2007*, Sept. 21, 2007, at 6.

202.    More published warning signs continued to pile up.  In May 2007, researchers

Joshua Rosner and Joseph Mason "concluded in an 84-page study that the U.S. ratings

companies Standard & Poor's, Moody's and Fitch had been wrong to bless billions of dollars of

mortgage securities with AAA and BBB ratings."  Mark Pittman, *Moody's, S&P Understate*

*Subprime Risk, Study Says*, Bloomberg L.P., May 3, 2007; *see also* Joseph R. Mason & Joshua

Rosner, *Where Did the Risk Go? How Misapplied Bond Ratings Cause Mortgage Backed*

*Securities and Collateralized Debt Obligation Market Disruptions* (presented at The Hudson

Institute, May 3, 2007).

203.     On August 31, 2007, then President Bush announced a limited bailout of U.S. homeowners unable to pay the rising costs of their debts.  Steven R. Weisman, *Bush Plans a Limited Intervention on Mortgages*, N.Y. Times, Sept. 1, 2007, at C1.

204.     In September 2007, the market for MBS evaporated and credit markets froze.

205.     In addition to these published warnings, the credit crisis is not without precedent. An overheated housing market and imprudent lending in the 1980s and 1990s caused the Savings and Loan Crisis, which resulted in hundreds of bank failures and helped lead the country into a recession.  In 1998, the collapse of a single hedge fund, Long-Term Capital Management, temporarily froze credit markets around the world, foreshadowing the current credit market paralysis.  Finally, in the late 1990s, the dot-com bubble burst, wiping out trillions of dollars in market value of technology companies and triggering another recession.

206.     As early as 2002, the pattern began to emerge again: interest rates were dropping and home prices were rising.  The country was in the midst of another housing bubble.  And by the fall of 2005, housing prices were falling.  Nonetheless, Wachovia continued its quest for market share throughout the Class Period, continually assuring investors and the Class that the Company was well positioned to capitalize on the housing market downturn even as foreclosure rates doubled.

207.     To the extent that some Defendants did not have actual knowledge of the riskiness of Wachovia's stock, Defendants were on notice by virtue of the published reports and several additional "red flags" that should have caused them to investigate the risks posed by Wachovia's business model.

208.     The red flags include:

- In May 2006, Wachovia acquired Golden West, the second largest thrift in the U.S. Golden West's $125 billion in assets, were wholly comprised of high-risk option-ARM mortgages.

- At the time of the Golden West acquisition executives from both companies touted the deal as a win-win for both companies, however, investors did not receive the acquisition news as a positive for Wachovia and the Company's share price sunk.

- Shortly after the Golden West acquisition, Wachovia aggressively marketed Pick-A-Pay loans, only reducing its volume in the third-quarter 2008.

- From 2006 through 2007, Wachovia expanded into the wholesale mortgage market, creating CDOs comprised in part by large quantities of MBS from its own Pick-A-Pay and wholesale mortgage portfolios.

- On January 22, 2008, Wachovia disclosed that it was not adhering to its policy of writing down the value of its option ARMs on a 180 day overdue basis. Instead, the Company recognized charge-offs of the option ARM mortgage pool after an actual property sale that resulted in a time period much greater than the aforementioned 180 day policy.

- Effective June 1, 2008, Defendant Thompson was forced to resign by the Board, after seven years as CEO and over thirty years at the Company.

- On July 9, 2008, Wachovia appointed Defendant Steel as CEO, and it was widely recognized that Steel was brought in to downsize the Company to reduce risk and avert a total collapse. At that time, Wachovia's chairman opined that there had been "a complete recognition at the board level that Golden West was a mistake, and [they] had to deal with the consequences of it."

- On September 15, 2008, Defendant Steel said that the Company's total loan portfolio exposure was $10 billion. Two weeks after the Wachovia had been acquired by Wells Fargo, Wells Fargo disclosed it would write down $65 billion of Wachovia's loan portfolio.

- On October 3, 2008, Wells Fargo and Wachovia entered into an Agreement and Plan of Merger.

209.    Additionally, Wachovia experienced numerous credit and stock analyst

downgrades in 2008:

January 22    Moody's Investor Services ("Moody's") placed Wachovia's debt ratings on outlook negative in light of (1) the softening real estate market, especially in California where the majority of the loans in the Company's option ARM portfolio are based, (2) the significant risks inherent in Wachovia's structured finance products like CDOs, and (3) the large amount of capital it took to fund the dividend payment.

February 4    Merrill Lynch dropped its stock analyst rating of Wachovia to "sell," citing the weakened housing market and Wachovia's inadequate provisions for loan losses.

April 15    Wachovia's earnings expectations were reduced by two stock analysts.

April 21    Moody's downgraded the ratings of Wachovia subprime residential MBS "based on higher than anticipated rates of delinquency, foreclosure, and REO in the underlying collateral relative to credit enhancement levels."

June 2    Standard & Poor's ("S&P") placed Wachovia's credit rating on CreditWatch negative in response to the Company's sudden removal of CEO Thompson.

June 27    Fitch Ratings ('Fitch") placed Wachovia's credit ratings on outlook negative for under-reserving for future, probable losses and inadequately writing off bad loans in its option ARM portfolio and the Company's significant concentration of the option ARM portfolio in California, a state that was experiencing the largest decrease in housing prices and the largest increase in defaults and delinquencies.

July 8    A JPMorgan Chase & Co. analyst reduced Wachovia's earnings expectations from a profit to a loss, citing increased credit losses and deterioration in its loan portfolio.

July 10    S&P stated it would keep Wachovia's credit ratings on outlook negative based on the higher than expected loss for the second quarter.
Moody's placed Wachovia's credit ratings under review for possible downgrades following the announcement of larger than expected losses in the second quarter on its Option ARM portfolio. The review will focus on (1) the likely losses from the Option ARM portfolio, (2) building its capital base, (3) asset quality indicators in other loan portfolios, and (4) its future business prospects under a new CEO.

July 11    Wachovia's rating was cut by a stock analyst in fear of a forced capital raise due to deteriorating capital ratios, sending the Company's share price down 12 percent, the most in a single day since 1987. The stock price ended the day at $11.54.

July 15    Wachovia's stock rating was cut by a stock analyst, who predicted that earnings performance would be low and asset valuations would need to come down.

| July 22 | S&P downgraded Wachovia's credit ratings in response to second quarter earnings that disclosed "an after-tax loss of $8.9 billion, which included a sizable $6.1 billion goodwill write-off," and "an oversize loan-loss provision of $5.6 billion." |
| | |
| | Fitch downgraded Wachovia's credit rating and continued to place it on outlook negative. The downgrade was related to "the increasingly pronounced asset quality deterioration evident in Wachovia's mortgage portfolio, specifically the Golden West-originated Pick-A-Pay (Option ARM)." |
| | Moody's cut Wachovia's credit ratings and maintained a negative outlook. The downgrades were related to the current and future massive losses in the option ARM portfolio. |
| September 9 | A Merrill Lynch stock analyst cut Wachovia's stock rating, citing to bleak earnings prospects in the near future. |

210. These red flags and the published warnings detailed above emerged as early as 2005. As ERISA fiduciaries charged with the highest duty known to law, Defendants were required to investigate the merits of the Plans' huge investment in Wachovia stock and take prompt and effective action to protect the Plans from unnecessary losses. *See, e.g., Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983). Defendants failed to do so.

211. Given the size of the Plans' investment in Wachovia stock, the turmoil faced by the high-risk loan market, and the precipitous decline in the Company's share price, prudent fiduciaries of the Plans should have fully investigated the risks faced by the Company, carefully monitored the Plans' investment in Company stock, and taken appropriate actions to protect the Plans' participants and beneficiaries from enormous losses. Instead, Defendants did nothing.

212. Defendants had available to them several options for satisfying their fiduciary duties, including: (1) making appropriate public disclosures, as necessary; (2) divesting the Plans of Wachovia stock; (3) discontinuing further investment in Wachovia stock under the Plans; (4) consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the Plans' participants; and/or (5) resigning as fiduciaries of the Plans to the extent that as a result of their employment by or association with Wachovia they were unable to

loyally serve the Plans and the Plans' participants in connection with the Plans' acquisition and holding of Wachovia stock.

213. In the end, when the severity of the circumstances came to light, the Plans suffered significant losses, all or some of which could have been avoided had the Plans' fiduciaries acted prudently and loyally to protect the interests of Plan participants, as required by ERISA.

**C.      Defendants Failed to Provide the Plans' Participants with Complete and Accurate Information about the True Risks of Investment in Wachovia Stock in the Plans.**

214. ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries. *See, e.g., Griggs v. E.I. Dupont de Nemours & Co*., 237 F.3d 371, 380-81 (4th Cir.2001) (An ERISA fiduciary has a duty not to make material misrepresentations to beneficiaries, or provide incomplete, inconsistent, or contradictory disclosures that misinform beneficiaries, as well as an an affirmative duty to provide participants with information material to the participants' circumstances, even when the participant has not specifically asked for the information) (*citing Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1993)).

215. During the Class Period, on information and belief, Wachovia and top executives made direct and indirect communications to the Plans' participants through Wachovia's internal communications systems, including an employee intranet, employee conference calls, employee emails, and written publications for employees, and as wells as public statements regarding the financial health of the Company.

216.     The Company regularly communicated with employees, including participants in the Plans, about the performance, future financial and business prospects of the Company's common stock.  These communications included, but were not limited to, SEC filings, annual reports, and press releases that were, upon information and belief, incorporated by reference into the Plans' documents and Plan-related materials and directed to participants and, thus, were Plan communications undertaken in a fiduciary capacity.  These communications by Defendant Wachovia assured the participants that the Company was not unduly exposed to risks related to its subprime lending and CDO exposure, and that the Company's risk management practices were appropriate, when in fact the extent of the risks faced by the Company was unduly minimized and the extent of the Company's risk management practices was overstated.

217.     Against the backdrop of these misleading communications, Wachovia and the Benefits Committee Defendants failed to disclose facts that would have apprised the Plans' participants and beneficiaries of the risks presented by Company stock that, in turn, would have allowed them to conclude that their exposure to Company stock through the Plans should be reduced, or that Company stock was not a prudent retirement investment.

218.     Defendants, as the Plans' fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) literature and the trade press, concerning investment in company stock, including that:

> (a)     Employees tend to interpret a match in company stock as an endorsement of the company and its stock;
>
> (b)     Out of loyalty, employees tend to invest in company stock;
>
> (c)     Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(d)     Employees tend not to change their investment option allocations in the plan once made;

(e)     No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

(f)     Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(g)     Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with it rewards.

Bridgitte C. Mandrian & Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001); *see also* Nellie Liang & Scott Weisbenner, *Investor Behavior and the Purchase Of Company Stock in 401(k) Plans: The Importance of Plan Design, Board of Governors for the Federal Reserve System Finance and Economics Discussion Series*, No. 2002 36 (2002).

219.     Even though Defendants knew or should have known these facts, and even though Defendants knew of the concentration of the Plans' assets in Company stock during the Class Period, Defendants failed to take any meaningful ameliorative action to protect the Plans and thus the participants from their heavy investment in an imprudent retirement vehicle, Wachovia stock.

220.     In addition, Defendants failed to provide the Plans' participants and beneficiaries, and the market as a whole, with complete and accurate information regarding the true financial condition of the Company. As such, participants in the Plans could not appreciate the true risks

presented by investments in Company stock and therefore could not make informed decisions regarding their investments in Company stock in the Plans.

221. Specifically, Defendants failed to provide the Plans' participants and beneficiaries with complete and accurate information regarding Wachovia's serious mismanagement and improper business practices, including, among other practices: (a) the Company's reckless concentration on loan production in spite of the declining mortgage market; (b) the Company's failure to limit its exposures and risks especially with respect to the acquisition of Golden West; (c) the Company's failure to accurately account for its high-risk mortgage and CDO holdings; (d) the Company's imprudent loan underwriting practices and reliance on inadequate risk management and accounting practices; and (e) Wachovia's repeated misrepresentations of the Company's true financial condition.

222. As a result, participants and beneficiaries in the Plans could not appreciate the true risks presented by investments in Company stock and, therefore, could not make informed decisions regarding their Plans' investments in Company stock.

223. Additionally, Wachovia and Defendants Langley, Smith, Steel, Thompson, and Wurtz, and on information and belief, certain other Defendants, knew all (in the case of the Company) or a large portion of the truth about the Company's financial condition and in particular about the risks posed to the Company by its exposure to risky and hard to value investments, especially those which exposed the Company to subprime and other high-risk loans, as detailed previously. On information and belief, these Defendants with a greater knowledge of the risks posed by the Plans' investment in Company stock failed to disclose this information to their co-fiduciaries who on the Benefits Committee, and were empowered by the documents governing the Plans and ERISA to protect the Plans and the Plans' participants and beneficiaries

by eliminating or limiting investment in Company stock, selling Company stock, and making appropriate disclosures to the Plans' participants and beneficiaries.

**D.      Defendants Suffered From Conflicts of Interest.**

224.      As ERISA fiduciaries, Defendants were required to manage the Plans' investments, including the investment in Wachovia stock, solely in the interest of the Plans' participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and beneficiaries.  This duty of loyalty requires fiduciaries to avoid conflicts of interest and to resolve them promptly when they occur.

225.      Conflicts of interest abound when a company that invests plan assets in company stock founders.  This is because as the situation deteriorates, plan fiduciaries are torn between their duties as officers and directors for the company on the one hand, and to the plan and plan participants on the other.  As courts have made clear "'[w]hen a fiduciary has dual loyalties, the prudent person standard requires that he make a careful and impartial investigation of all investment decisions.'"  *Martin v. Feilen,* 965 F.2d 660, 670 (8th Cir.1992) (citation omitted). Here, Defendants breached this fundamental fiduciary duty.

226.      Defendants failed to investigate whether to take appropriate and necessary action to protect the Plans, and instead, chose the interests of the Company over the Plans by continuing to offer Wachovia stock as an investment option for participant contributions, continuing to make Company Matching Contributions in Wachovia stock, and continuing to maintain investments in Wachovia stock in the Plans.

## VIII.  THE RELEVANT LAW

227.      ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

228.     ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty,"

provides, in pertinent part:

> any person who is a fiduciary with respect to a plan who breaches any of the
> responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter
> shall be personally liable to make good to such plan any losses to the plan
> resulting from each such breach, and to restore to such plan any profits of such
> fiduciary which have been made through use of assets of the plan by the fiduciary,
> and shall be subject to such other equitable or remedial relief as the court may
> deem appropriate, including removal of such fiduciary.

229.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to

seek equitable relief from defendants, including, without limitation, injunctive relief and, as

available under applicable law, constructive trust, restitution, and other monetary relief.

230.     ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provides, in

pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the

interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to

participants and their beneficiaries, and with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims.

231.     These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the

duties of loyalty, exclusive purpose and prudence and are the "highest known to the law."

*Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).  They entail, among other things:

(a)     The duty to conduct an independent and thorough investigation into, and

to continually monitor, the merits of all the investment alternatives of a plan, including in

this instance the Wachovia Corp. Common Stock Fund, the Wachovia Stock Non-ESOP

Fund, and the Wachovia Stock Fund which invested in Wachovia stock, to ensure that

each investment is a suitable option for the plan;

(b)     The duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(c)     The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

232.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary," provides, in pertinent part:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

233.    Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility.  Because ERISA permits the fractionalization of the fiduciary duty, there may be, as in this case, several ERISA fiduciaries involved in a given issue, such as the role of company stock in a plan.  In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit their responsibilities as much as possible and to ignore the conduct of other fiduciaries.  The result would be a setting in which a major fiduciary breach could occur, but the responsible party

could not easily be identified. Co-fiduciary liability obviates this. Even if a fiduciary merely knows of a breach, a breach he had no connection with, he must take steps to remedy it:

> [I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . . . [T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor. The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co-fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

234. Plaintiffs therefore bring this action under the authority of ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plans arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## IX.   CAUSES OF ACTION

### A.   Count I:  Failure to Prudently and Loyally Manage the Plans and Assets of the Plans.

235. Plaintiffs incorporate by this reference the paragraphs above.

236. This Count alleges fiduciary breach against the following Defendants: Wachovia, the Compensation Committee Defendants and the Benefits Committee Defendants (the "Prudence Defendants"); this Count further alleges liability against Wells Fargo by virtue of its status as Wachovia's successor-in-interest.

237. As alleged above, during the Class Period the Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

238.     As alleged above, the scope of the fiduciary duties and responsibilities of the Prudence Defendants included, on information and belief, managing the assets of the Plans for the sole and exclusive benefit of the Plans' participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA.  The Compensation Committee Defendants were directly responsible for, among other things, reviewing and making policy recommendations with respect to the Plans.  The Benefits Committee Defendants were directly responsible for, among other things, evaluating the merits of all of the Plans' investments options—including the Wachovia stock funds—on an ongoing basis, selecting prudent investment options, eliminating imprudent options, determining the portion of Company Contributions that would be invested in Wachovia stock in the Wachovia Plan, and directing the trustee regarding the investment options.  Wachovia exercised authority and control with respect to the responsibilities of the Prudence Defendants, making itself fully responsible for the prudent and loyal fulfillment of the responsibilities assigned by the governing documents to the other Prudence Defendants, without relieving them of any such responsibility.

239.     Yet, contrary to their duties and obligations under ERISA, the Prudence Defendants failed to loyally and prudently manage the assets of the Plans.  Specifically, during the Class Period, the Prudence Defendants knew or should have known that Wachovia common stock no longer was a suitable and appropriate investment for the Plans, but was, instead, a highly speculative and risky investment in light of the Company's improper business practices, serious mismanagement, misstatement and omissions that caused the price of Wachovia stock to be artificially inflated, and the impending collapse of the price of the stock as a result of these dire circumstances.  Nonetheless, during the Class Period, the Prudence Defendants continued to offer Wachovia stock as an investment option for participant contributions, provide Company

Matching Contributions and Company Contributions in Wachovia stock, and maintain the Plans' enormous investment in the stock.

240. The Prudence Defendants were obliged to prudently and loyally manage all of the Plans' assets. However, their duties of prudence and loyalty were especially significant with respect to Company stock because: (a) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and (b) participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock. In view of this, the Prudence Defendants were obliged to have in place a regular, systematic procedure for evaluating the prudence of investment in Company stock.

241. Moreover, the Prudence Defendants failed to conduct an appropriate investigation of the merits of continued investment in Wachovia stock even in light of the losses, the Company's highly risky and inappropriate practices, and the particular dangers that these practices posed to the Plans. Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain investment in Wachovia stock under these circumstances.

242. The Prudence Defendants' decisions respecting the Plans' investment in Wachovia stock described above, under the circumstances alleged herein, abused their discretion as ERISA fiduciaries in that a prudent fiduciary acting under similar circumstances would have made different investment decisions. Specifically, based on the above, a prudent fiduciary could not have reasonably believed that further and continued investment of the Plans' contributions and assets in Wachovia stock was in keeping with the Plans' settlor expectations of how a prudent fiduciary would operate.

243.     The Prudence Defendants were obligated to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

244.     According to DOL regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

245.     Again, according to DOL regulations,  "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

    o   The composition of the portfolio with regard to diversification;

    o   The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

    o   The projected return of the portfolio relative to the funding objectives of the plan.

246.     Given the conduct of the Company as described above, the Prudence Defendants could not possibly have acted prudently when they continued to invest the Plans' assets in Wachovia stock because, among other reasons:

- The Prudence Defendants knew of and/or failed to investigate the failures of the Company, including, but not limited to the following, which made the Company an extremely risky and imprudent investment for the Plans: (a) the Company's reckless concentration on loan production in spite of the declining mortgage market; (b) the Company's failure to limit its exposures and risks especially with respect to the acquisition of Golden West; (c) the Company's failure to accurately account for its high-risk mortgage and CDO holdings; (d) the Company's imprudent loan underwriting practices and reliance on inadequate risk management and accounting practices; and (e) Wachovia's repeated misrepresentations of the Company's true financial condition.

- The risk associated with the investment in Wachovia stock during the Class Period was far above and beyond the normal, acceptable risk associated with investment in company stock;

- This abnormal investment risk could not have been known by the Plans' participants, and the Prudence Defendants knew that it was unknown to them (as it was to the market generally), because the fiduciaries never disclosed it;

- Knowing of this extraordinary risk, and knowing the Plans' participants did not know it, the Prudence Defendants had a duty to avoid permitting the Plans or any participant from investing the Plans' assets in Wachovia stock; and

- Further, knowing that the Plans were not diversified portfolios, but were heavily invested in Company stock, the Prudence Defendants had a heightened responsibility to divest the Plans of Company stock if it became or remained imprudent.

247.     The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor. On information and belief, the compensation and tenure of the Prudence Defendants was tied to the performance of Wachovia stock and/or the publicly reported financial performance of Wachovia. Fiduciaries laboring under such conflicts, must, in order to comply with the duty of loyalty, make special efforts to

assure that their decision making process is untainted by the conflict and made in a disinterested fashion, typically by seeking independent financial and legal advice obtained only on behalf of the plan.

248.    The Prudence Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*, failing to engage prudent independent advisors who could make independent judgments concerning the Plans' investment in Wachovia; failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made Wachovia stock an unsuitable investment for the Plans; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to avoid adversely impacting their own compensation or drawing attention to Wachovia's inappropriate practices; and by otherwise placing their own and Wachovia's improper interests above the interests of the participants with respect to the Plans' investment in Wachovia stock.

249.    As a consequence of the Prudence Defendants' breaches of fiduciary duties alleged in this Count, the Plans suffered significant losses.  If the Prudence Defendants had discharged their fiduciary duties to prudently invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly the Plaintiffs and the other Class members, lost nearly *$2 billion* of retirement savings.

250.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), the Prudence Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**B.     Count II:  Failure to Monitor Fiduciaries**

251.    Plaintiffs incorporate by this reference the allegations above.

252.    This Count alleges fiduciary breach against the following Defendants: Wachovia and the Director Defendants (the "Monitoring Defendants"); this Count further alleges liability against Wells Fargo by virtue of its status as Wachovia's successor-in-interest.

253.    As alleged above, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

254.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, and remove, and thus, monitor the performance of other fiduciaries, as follows:

| Monitoring Fiduciary | Monitored Fiduciary | Reference |
|---|---|---|
| Wachovia and the Director Defendants | Compensation Committee Defendants and Benefits Committee Defendants. | ¶¶ 73-78, 79-82. |

255.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

256.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their

appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

257. Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

258. The Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a) failing, at least with respect to the Plans' investments in Company stock, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to Company stock; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of Wachovia's highly risky and inappropriate business practices, and the likely impact of such practices on the value of the Plans' investment in Wachovia stock; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plans' assets; and (d) failing to remove appointees whose performance was inadequate in that they continued to make and maintain investments in Wachovia stock despite their knowledge of practices that rendered Wachovia stock an imprudent investment during the Class Period for participants' retirement savings in the Plans, and who breached their fiduciary duties under ERISA.

259.     As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the

Plans suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary

monitoring duties as described above, the losses suffered by the Plans would have been

minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary

duty alleged herein, the Plans, and indirectly the Plaintiffs and the other Class members, lost

nearly *$2 billion* of retirement savings.

260.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2)

and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plans caused by their

breaches of fiduciary duties alleged in this Count and to provide other equitable relief as

appropriate.

**C.     Count III: Breach of Fiduciary Duty to Disclose Necessary Information to Co-Fiduciaries.**

261.     Plaintiffs incorporate by this reference the allegations above.

262.     This Count alleges fiduciary breach against the following Defendants:  Wachovia

and Defendants Langley, Smith, Steel, Thompson, and Wurtz; this Count further alleges liability

against Wells Fargo by virtue of its status as Wachovia's successor-in-interest.

263.     Pursuant to the duties of prudence and loyalty which every ERISA fiduciary owes

to the plans that he serves pursuant to ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A)

and (B), such fiduciaries are required to disclose to their co-fiduciaries information that they

know is unavailable to their co-fiduciaries, but that such co-fiduciaries need to protect the

interests of the plan.  *See Glaziers and Glassworkers Union Local No. 252 Annuity Fund v.

Newbridge Securities*, 93 F.3d 1171 (3rd Cir. 1996).

264.     Defendant Wachovia and Defendants Langley, Smith, Steel, Thompson, and

Wurtz possessed non-public information during the Class Period about the risks posed by

Wachovia stock, which they knew could be used by other fiduciaries of the Plans (in particular the Compensation Committee Defendants and the Benefits Committee Defendants) to protect the Plans and their participants and beneficiaries.

265.     Defendant Wachovia and Defendants Langley, Smith, Steel, Thompson, and Wurtz profited from their breach of this duty.

266.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), Defendant Wachovia and Defendants Langley, Smith, Steel, Thompson, and Wurtz are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count, to disgorge any profits made through their breach and to provide other equitable relief as appropriate.

**D.     Count IV: Breach of Fiduciary Duty – Failure to Provide Complete and Accurate Information to the Plans' Participants and Beneficiaries.**

267.     Plaintiffs incorporate by this reference the allegations above.

268.     This Count alleges fiduciary breach against the following Defendant:  Wachovia and the Benefits Committee Defendants (the "Communications Defendants"); this Count further alleges liability against Wells Fargo by virtue of its status as Wachovia's successor-in-interest.

269.     At all relevant times, as alleged above, the Communications Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, the Communications Defendants were bound by the duties of loyalty, exclusive purpose, and prudence.

270.     At all relevant times, the scope of the fiduciary responsibility of the Communications Defendants included the communications and material disclosures to the Plans' participants and beneficiaries.

271.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the plan with complete and accurate information, and to refrain from providing false information or concealing material information, regarding plan investment options so that participants can make informed decisions with regard to the prudence of investing in such options made available under the plan. This duty applies to all of the Plans' investment options, including investment in Wachovia stock.

272.    Because investments in the Plans were not diversified (*i.e.* the Prudence Defendants chose to invest the Plans' assets, and/or allow those assets to be invested heavily in Wachovia stock), such investment carried with it an inherently high degree of risk. This inherent risk made Communications Defendants' duty to provide complete and accurate information particularly important with respect to Wachovia stock.

273.    The Communications Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding Wachovia's serious mismanagement and improper business practices and public misrepresentations, and the consequential artificial inflation of the value of Wachovia stock, and, generally, by conveying incomplete information regarding the soundness of Wachovia stock and the prudence of investing and holding retirement contributions in Wachovia equity. These failures were particularly devastating to the Plans and the participants and beneficiaries; a heavy percentage of the Plans' assets were invested in Wachovia stock during the Class Period and, thus, losses in this investment had a significant impact on the value of participants' retirement assets.

274. The Communications Defendants' omissions clearly were material to participants' ability to exercise informed control over their accounts in the Plans, as in the absence of such information, participants did not know the true risks presented by the Plans' investment in Wachovia stock.

275. The Communications Defendants' omissions and incomplete statements alleged herein were Plan-wide and uniform in that the Defendants failed to provide complete and accurate information to any of the Plans' participants.

276. The Communications Defendants were unjustly enriched by the fiduciary breaches described in this Count.

277. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiffs and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

278. Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409(a), 29 U.S.C. § 1109(a), the Communications Defendants are is liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

**E.      Count V:  Co-Fiduciary Liability**

279. Plaintiffs incorporate by this reference the allegations above.

280. This Count alleges co-fiduciary liability against the following Defendants: all Defendants other than Wells Fargo (the "Co-Fiduciary Defendants"); this Count further alleges liability against Wells Fargo by virtue of its status as Wachovia's successor-in-interest.

281. As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

282.     As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Co-Fiduciary Defendants breached all three provisions.

283.     **Knowledge of a Breach and Failure to Remedy.**  ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.  Each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.  In particular, they did not communicate their knowledge of the Company's improper activities to the other fiduciaries.

284.     Wachovia, through its officers and employees, was unable to meet its business goals, engaged in highly risky and inappropriate business practices, withheld material information from the market, and profited from such practices, and, thus, knowledge of such practices is imputed to Wachovia as a matter of law.

285.     Because Defendants knew of the Company's failures and inappropriate business practices, they also knew that the Prudence Defendants were breaching their duties by continuing to invest in Company stock.  Yet, they failed to undertake any effort to remedy these breaches. Instead, they compounded them by downplaying the significance of Wachovia's failed and inappropriate business practices, and obfuscating the risk that the practices posed to the Company, and, thus, to the Plans.

286.   **Knowing Participation in a Breach.**  ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach.  Wachovia knowingly participated in the fiduciary breaches of the Prudence Defendants in that it benefited from the sale or contribution of its stock at prices that were disproportionate to the risks for the Plans' participants.  Likewise, the Monitoring Defendants knowingly participated in the breaches of the Prudence Defendants because, as alleged above, they had actual knowledge of the facts that rendered Wachovia stock an imprudent retirement investment and yet, ignoring their oversight responsibilities, permitted the Prudence Defendants to breach their duties.

287.   **Enabling a Breach.**  ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

288.   The Monitoring Defendants' failure to monitor the Prudence Defendants enabled those committees to breach their duties.

289.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans and indirectly the Plaintiffs and the Plans' other participants and beneficiaries, lost nearly *$2 billion* of retirement savings.

290.   Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**F.  Count VI:  Knowing Participation in a Breach of Fiduciary Duty by a Non-Fiduciary**

291.     Plaintiffs incorporate by this reference the allegations above.

292.     This Count is alleged against Wells Fargo by virtue of its status as Wachovia's successor-in-interest.

293.     To the extent that Wachovia is found not to have been fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, Wachovia knowingly participated in the breaches of those Defendants who were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief as a result of participating in such breaches.

294.     Wachovia benefited from the breaches by discharging its obligations to make contributions to the Plans in amounts specified by the Plans, contributing Wachovia stock to the Plans while the value of the stock was inflated as the result of Wachovia's highly risky and improper business and accounting practices, and providing the market with materially misleading statements and omissions.  Accordingly, Wells Fargo may be required to disgorge this benefit or a constructive trust should be imposed on treasury shares of Wachovia stock which would have been contributed to the Plans, but for Wachovia's participation in the foregoing breaches of fiduciary duty.

## X.    CAUSATION

295.     The Plans suffered nearly *$2 billion* in principal losses because substantial assets of the Plans were imprudently invested or allowed to be invested by Defendants in Wachovia stock during the Class Period, in breach of Defendants' fiduciary duties.

296.     Defendants are liable for the Plans' losses in this case because: (a) the ESOPs' investment in Wachovia stock was the result of the Prudence Defendants' decision to invest a

portion of the Company Matching Contributions and Company Contributions in Wachovia stock; and (b) as to the portion of the Plans' assets invested in Wachovia stock as a result of participant contributions and/or Company Matching Contributions and/or Company Contributions, the Prudence Defendants are liable for these losses because they failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process.

297.    Had the Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, eliminating Wachovia stock as an investment alternative when it became imprudent, and divesting the Plans of Wachovia stock when maintaining such an investment became imprudent, the Plans would have avoided some or all of the losses that it, and indirectly, the participants suffered.

## XI.    REMEDY FOR BREACHES OF FIDUCIARY DUTY

298.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plans' assets should not have been invested in Wachovia stock during the Class Period.

299.    As a consequence of the Defendants' breaches, the Plans suffered significant losses.

300.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary…who breaches any of the…duties imposed upon fiduciaries…to make good to such plan any losses to the plan…."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate…."

301.     With respect to calculation of the losses to the Plans, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plans' participants and beneficiaries would not have made or maintained their investments in the challenged investment and, instead, prudent fiduciaries would have invested the Plans' assets in the most profitable alternative investment available to them.  Alternatively, losses may be measured not only with reference to the decline in stock price relative to alternative investments, but also by calculating the additional Wachovia stock that the Plans would have acquired had the Plans' fiduciaries taken appropriate steps to protect the Plans.  The Court should adopt the measure of loss most advantageous to the Plans.  In this way, the remedy restores the Plans' lost value and puts the participants and beneficiaries in the position they would have been in if the Plans had been properly administered.

302.     Plaintiffs and the Class are therefore entitled to relief from the Defendants in the form of: (a) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); (c) injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3), for knowing participation by a non-fiduciary in a fiduciary breach; (d) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

303.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plans in this case.

## XII.   CLASS ACTION ALLEGATIONS

304.    **Class Definition.**  Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plaintiffs and the following class of persons similarly situated (the "Class"):

> All persons, other than Defendants, who were participants in or beneficiaries of the Plans at any time between May 8, 2006 and December 31, 2008 and whose accounts included investments in Wachovia stock.

305.    **Class Period.**  The fiduciaries of the Plans knew or should have known at least by May 8, 2006 that the Company's material weaknesses were so pervasive that Wachovia stock could no longer be offered as a prudent investment for a retirement plan.

306.    **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to the Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are, based on the Wachovia Plan's Form 5500 for Plan year 2004, over 100,000 participants or beneficiaries in the Wachovia Plan.  Based on the AGE Plan's Form 5500 for Plan year 2007, there were nearly 25,000 participants or beneficiaries in the AGE Plan.

307.    **Commonality.**  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants each owed a fiduciary duty to Plaintiffs and members of the Class;

(b)    whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plans' participants and beneficiaries;

(c)    whether Defendants violated ERISA; and

(d)    whether the Plans have suffered losses and, if so, what is the proper measure of damages.

308.    **Typicality.**  Plaintiffs' claims are typical of the claims of the members of the Class because:  (a) to the extent Plaintiffs seek relief on behalf of the Plans pursuant to ERISA § 502(a)(2), their claim on behalf of the Plans are not only typical to, but identical to a claim under this section brought by any Class member; and (2) to the extent Plaintiffs seek relief under ERISA § 502(a)(3) on behalf of themselves for equitable relief, that relief would affect all Class members equally.

309.    **Adequacy.**  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

310.    **Rule 23(b)(1)(B) Requirements.**  Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

311.    **Other Rule 23(b) Requirements.**  Class action status is also warranted under the other subsections of Rule 23(b) because: (1) prosecution of separate actions by the members of

the Class would create a risk of establishing incompatible standards of conduct for Defendants;
(2) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby
making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect
to the Class as a whole; and (3) questions of law or fact common to members of the Class
predominate over any questions affecting only individual members and a class action is superior
to the other available methods for the fair and efficient adjudication of this controversy.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.      A Declaration that each of the Defendants, except for Wells Fargo, have breached
their ERISA fiduciary duties to the participants;

B.      A Declaration that Wells Fargo is liable for Wachovia's breaches of fiduciary
duty;

B.      An Order compelling the Defendants to make good to the Plans all losses to the
Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans
resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits
the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which
the participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.      Imposition of a Constructive Trust on any amounts by which any Defendant was
unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

D.      Actual damages in the amount of any losses the Plans suffered, to be allocated
among the participants' individual accounts in proportion to the accounts' losses;

E.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

F.      An Order awarding attorneys' fees pursuant to the common fund doctrine,
29 U.S.C. § 1132(g), and other applicable law; and

G.      An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants.

Dated: September 18, 2009.

Respectfully submitted,

**KELLER ROHRBACK L.L.P**

_____

Lynn Lincoln Sarko (LS-3700)
lsarko@kellerrohrback.com
Derek W. Loeser (DL-6712)
dloeser@kellerrohrback.com
Erin M. Riley (ER-7673)
eriley@kellerrohrback.com
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone:  (206) 623-1900
Facsimile:  (206) 623-3384

**KELLER ROHRBACK L.L.P**
David S. Preminger (DP-1057)
dpreminger@kellerrohrback.com
770 Broadway, Second Floor
New York, NY  10003
Telephone:  (646) 495-6198
Facsimile:  (646) 495-6197

*Interim Lead Counsel for the Class and Counsel*
*for Plaintiffs Hardman, Dziak, and Kelley*

**WYATT & BLAKE, L.L.P.**
James Wyatt
jwyatt@wyattlaw.net
Robert A. Blake, Jr.
rblake@wyattlaw.net
435 E. Morehead Street
Charlotte, NC  28202-2609
Telephone: (704) 331-0767
Facsimile:  (704) 331-0773

*Interim Liaison Counsel for the Class*

**HOLZER HOLZER & FISTEL, LLC**
Michael I. Fistel, Jr.
Corey D. Holzer
Marshall P. Dees
1117 Perimeter Center West, Suite E-107
Atlanta, GA  30338
Telephone:  (770) 392-0090

98

Facsimile: (770) 392-0029

**DYER & BERENS, LLP**
Jeffrey A. Berens
682 Grant Street
Denver, CO 80203
Telephone: (303) 861-1764
Facsimile: (303) 395-0393

*Counsel for Plaintiff Wright*

**SQUITIERI & FEARON, LLP**
Stephen J. Fearon, Jr.
32 East 57th Street
New York, NY 10022
Telephone: (212) 421-6492
Facsimile: (212) 421-6553

*Counsel for Plaintiff Allen*

**NOBEL IZARD LLP**
Mark Kindall
One Corporate Center
20 Church Street, Suite 1700
Hartford, CT 06103
Telephone: (860) 493-6292
Facsimile: (860) 493-6290

*Counsel for Plaintiff Cominsky*

**SPECTOR ROSEMAN
KODROFF & WILLIS, P.C.**
Robert M. Roseman
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

*Counsel for Plaintiff Hansen*

**LINER GRODE STEIN YANKELEVITZ**
Ronald S. Kravitz
199 Fremont Street, 20th Floor
San Francisco, CA 94105
Telephone: (415) 489-7700
Facsimile: (415) 489-7701

*Counsel for Plaintiff Tuttle*